OHIO CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 117 Ohio St.3d 301, 2008-Ohio-861.]

(No. 2007–0659—Submitted December 12, 2007—Decided March 6, 2008.)

O'CONNOR, J.

{¶ 1} This is an appeal as of right by appellant, Ohio Consumers' Counsel ("OCC"), from an order of the Public Utilities Commission of Ohio ("commission" or "PUCO"). The commission approved an application by intervening appellee, AT & T Ohio ("AT & T"), for alternative regulation of its basic local exchange telephone service in 136 of AT & T's telephone exchanges. OCC appealed, arguing that the decision is unlawful due to the inadequacy of the commission's rules and their improper application.

{¶ 2} We hold that the commission appropriately relied on the statutory amendments and created lawful and reasonable tests to effectuate those changes. Likewise, we affirm the commission's factual determinations in approving AT & T's application.

## BACKGROUND

{¶ 3} On November 4, 2005, Am.Sub.H.B. No. 218 ("H.B. 218") took effect, amending certain provisions of the state telecommunications law. Affected statutes include R.C. 4905.04, 4927.02, 4927.03, and 4927.04. This appeal deals with changes to R.C. 4927.02 and 4927.03, which deal with exemption from regulation and alternative regulation.

{¶ 4} The amendments to R.C. 4927.02 set forth the policy in this area of the law, which includes reliance on market forces to maintain just and reasonable rates, consideration of competitive services in determining the scope of the commission's regulation, and a prohibition against unduly favoring or disadvantaging providers of competing services. R.C. 4927.02(B) directs that the commission use these policy guidelines to carry out the chapter and to reduce or eliminate the regulation of telephone companies under those sections.

{¶ 5} Together with these new policy considerations, the General Assembly expanded the services eligible for alternative regulation in R.C. 4927.03(A)(1) by authorizing the commission to grant alternative regulation of basic local exchange service ("BLES") offered by incumbent local exchange companies ("ILECs").

Previously, the statute allowed alternative regulation for any service other than BLES.[1]

{¶ 6} R.C. 4927.03(A)(1) allows the commission to exempt phone companies from traditional rate regulation when it is in the public interest and either the utility is "subject to competition" for that service or customers have "reasonably available alternatives." R.C. 4927.03(A)(1)(a) and (b). In addition, the commission must find that there are "no barriers to entry." R.C. 4927.03(A)(3). R.C. 4927.03(C) allows the commission to abrogate or modify orders awarding alternative regulation if the findings it relied on are no longer valid and if that action is in the public interest.

{¶ 7} In response to H.B. 218, the commission established rules for the alternative regulation of basic local exchange service. See Ohio Adm.Code 4901:1–4–01 et seq.; *In the Matter of the Implementation of H.B. 218 Concerning Alternative Regulation of Basic Local Exchange Service of Incumbent Local Exchange Telephone Companies* (Mar. 7, 2006), PUCO No. 05–1305–TP–ORD, 2006 WL 707476 (*"05–1305"*). These rules covered everything from the geographic area that would be considered for awarding alternative regulation to the tests an ILEC must meet to be eligible for alternative regulation. The rules became effective on August 7, 2006.

{¶ 8} In Ohio Adm.Code 4901:1–4–10(C), the commission established four competitive tests to determine eligibility for alternative regulation. An applicant must satisfy at least one of these tests. The most important tests for purposes of this appeal are Ohio Adm.Code 4901:1–4–10(C)(3) and (4) ("Test 3" and "Test 4"). AT & T relied on Test 3 for 26 of its requested exchanges and on Test 4 for the remaining 119. Certain shared elements of the tests are challenged in this case by OCC.

{¶ 9} Test 3 has three main requirements. First, the applicant must demonstrate in each requested exchange that at least 15 percent of the total residential access lines are provided by unaffiliated competitive local exchange carriers. Second, the applicant must demonstrate the presence of at least two unaffiliated facilities-based competitive local exchange carriers providing basic local exchange service to residential customers. Third, the applicant must demonstrate the presence of at least five alternative providers serving the residential market. Ohio Adm.Code 4901:1–4–01(B) defines an alternative provider as a provider of competing services to the basic local exchange service offerings, regardless of the technology and facilities used in the delivery of the services.

---

1. Basic local exchange service is defined in R.C. 4927.01(A) and includes such features as dial tone, access to 9–1–1, access to an operator, listing in a directory, caller-identification-blocking service, access to relay service, and access to networks of other companies (i.e., long distance and toll providers).

{¶ 10} Test 4 requires that the applicant demonstrate that in each requested exchange area, the applicant has lost at least 15 percent of total residential access lines since 2002. The applicant must also demonstrate the presence of at least five unaffiliated facilities-based alternative providers serving the residential market.

{¶ 11} On December 20, 2006, the commission issued an opinion and order approving AT & T's application for alternative regulation of its basic local exchange telephone service in 136 of the requested 145 telephone exchanges.

## STANDARD OF REVIEW

{¶ 12} R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable. Under this statutory standard, this court will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record that it shows misapprehension, mistake, or willful disregard of duty. *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371.

{¶ 13} This presents a heavy burden for the party challenging an order, because this court has consistently deferred to the commission's judgment in matters that require the commission to apply its special expertise and discretion to make factual determinations. *Cincinnati Bell Tel. Co. v. Pub. Util. Comm.* (2001), 92 Ohio St.3d 177, 180, 749 N.E.2d 262; *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1976), 46 Ohio St.2d 105, 108, 75 O.O.2d 172, 346 N.E.2d 778. In *Stephens v. Pub. Util. Comm.*, 102 Ohio St.3d 44, 2004-Ohio-1798, 806 N.E.2d 527, the commission found under R.C. 4927.03(A)(1)(a) that a telephone company was "subject to competition" for purposes of eligibility for exemption from traditional regulation. We stated that if "a finding or decision of the commission is supported by sufficient record evidence, as is the case in this appeal, the court will not weigh the evidence and substitute its judgment for that of the commission." Id. at ¶ 16, citing *Time Warner AxS v. Pub. Util. Comm.* (1996), 75 Ohio St.3d 229, 233, 661 N.E.2d 1097. As in the present case, *Stephens* dealt with a factual determination under R.C. 4927.03(A)(1) that a telephone company was "subject to competition."

{¶ 14} Although we defer to factual findings and conclusions by the commission, this court has "complete and independent power of review as to all questions of law" in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922. Nevertheless, we have explained that we may rely on the expertise of a state agency in interpreting a law where

"highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## ANALYSIS

### Stand–Alone Service

{¶ 15} In its first proposition of law, OCC argues that the commission's analysis of what constitutes a competitive service under the competitive tests is too broad. Specifically, OCC asserts that the commission should not consider bundled-service offerings as "competition" for basic service when determining whether an applicant is "subject to competition." OCC asserts that because alternative treatment was already available for packages that include basic local exchange service, the changes in H.B. 218 apply only to stand-alone service, and only providers of stand-alone service count as "competition."

{¶ 16} The commission found that customers receiving basic local exchange service as part of a package are still considered basic local exchange service customers. Thus, the providers of those bundled services are potential alternative providers. The commission admits that alternative basic local exchange services might not be currently offered under terms and conditions identical to those offered by stand-alone providers, but argues that functionally equivalent or substitute services are readily available at competitive rates, terms, and conditions. The commission contends that R.C. 4927.03(A)(1) does not restrict the field of competitors and reasonably available alternatives to products that are exactly like the applicant's.

{¶ 17} The commission relied on evidence that AT & T had lost local exchange service customers in the presence of alternative providers and concluded that those customers must have found the other providers' rates, terms, and conditions to be a competitive and reasonable alternative to or substitute for AT & T's basic service. The commission suggests that it is reasonable to assume that customers would not have switched from AT & T's basic local exchange service had customers not found competitive rates, terms, and conditions elsewhere.

{¶ 18} In H.B. 218, the General Assembly amended R.C. 4927.02, which sets forth the policy for alternative regulation, in concert with R.C. 4927.03, which sets forth the requirements for eligibility. R.C. 4927.03 requires that the commission rely on market forces and consider the regulatory treatment of competing and functionally equivalent services when determining how and whether to regulate a given service. R.C. 4927.02(A)(2) and (6). The changes also include a preference for reducing or eliminating regulation of telephone companies in these areas. R.C. 4927.02(B).

{¶ 19} It is in the framework of these statutory changes that we review the relevant statutory provisions. R.C. 4927.03(A)(1)(a) and (b) require the commission to find either that the applicant is subject to competition for the service or that there are reasonably available alternatives to the service. R.C. 4927.03(A)(2)(c) directs that the commission, in making this finding, shall consider whether alternative providers are able to make "functionally equivalent or substitute services" readily available on competitive terms.

{¶ 20} The central issue is the scope of the term "competition" as used in R.C. 4927.03(A)(1)(a)'s phrase "subject to competition." If bundled services are providing competition to basic service, then those packages must be a part of the discussion. The question is which services compete with basic service.

{¶ 21} OCC's argument fails to recognize the legislative guidance provided by the changes to the policy section of the chapter in R.C. 4927.02. The General Assembly provided the commission with new standards to consider when determining eligibility for alternative regulation, and those standards included the consideration of the larger environment of voice communication providers.

{¶ 22} The commission established that bundled services provide competition to basic phone service. The commission determined that customers are switching service in the presence of competitors and that those customers find the alternative services to be adequate substitutes for AT & T's services. The court will not reverse or modify a commission decision as to questions of fact in cases in which the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. OCC has demonstrated that the alternative providers' services are different and offered at a variety of prices, but that showing does not overcome the commission's finding that those services are providing reasonable, competitive substitutes for basic local exchange service. We defer to the commission's expertise on this matter. Accordingly, we reject OCC's argument.

### Extent of Market Presence

{¶ 23} In its fifth proposition, OCC challenges the commission's application of Tests 3 and 4, which award alternative regulation if the applicant shows, inter alia, the presence of a minimum number of qualified alternative providers serving the residential market in each requested exchange area. OCC asserts that the four cable companies AT & T offered as alternative providers under both tests do not serve the entirety of the exchange areas, and the commission violated statutory requirements when it considered those providers. Failure to serve the entire exchange means that the service is not "readily available" within the

meaning of R.C. 4927.03(A)(2)(d). OCC makes similar claims about wireless carriers, arguing that unreliable and varying signal strength means that service may not be available at all times at all locations within an exchange.

{¶ 24} The commission argues that there is no requirement that all alternative providers offer ubiquitous service throughout the exchange. In its order, the commission called OCC's argument a "narrow interpretation," contending that OCC's position would require the relevant market to be reduced from an exchange to an area as small as a city block to ensure that every single customer has access to all alternate providers. The commission stated that OCC's argument would even require the commission to test cell coverage in individual homes.

{¶ 25} This dispute centers on the geographic area the commission approved to consider alternative regulation. According to R.C. 4927.03(A)(2)(b), the commission is required to consider the "extent to which services are available from alternative providers in the relevant market." The commission determined in the *05–1305* rulemaking proceeding that a telephone exchange was the relevant market it would utilize for this analysis. This term is defined in the commission's rules as "a geographical service area established by an [incumbent local exchange carrier] and approved by the commission, which usually embraces a city, town, or village and a designated surrounding or adjacent area. There are currently seven hundred thirty-eight exchanges in the state." Ohio Adm.Code 4901:1–4–01(M).

{¶ 26} We affirm the commission's finding that alternative providers have services readily available in AT & T's exchanges. The commission established the exchange area to judge the overall presence in that area, not a subset of that area. The commission found no requirement in the law or in its rules that an alternative provider must serve 100 percent of the relevant market. The commission points out that OCC supported using the telephone exchange as the relevant market in the *05–1305* rulemaking case. The area is small enough to share common characteristics while still providing years of historical data. Thus, it is reasonable to accept the commission's determination to judge the area as a whole.

### "Presence" of Alternative Providers

{¶ 27} OCC's first proposition questions the legitimacy of Test 4, arguing that by requiring only the "presence" of alternative providers in the exchange, the test fails to consider the size of those providers or other indicators of market power such as market share or growth, as required by R.C. 4927.03(A)(2). OCC's concern is that the mere presence in the market of an alternative provider does not show that the provider is able to contribute to a healthy, sustainable competitive market. See R.C. 4927.02(A)(2). OCC suggests that longevity is a better indicator of market power.

{¶ 28} The commission disagreed in its order, stating that Test 4 measures the overall state of the competitive market by considering the presence of a significant number of competitive providers in the relevant market in combination with the applicant's loss of a considerable share of its access lines. The commission found that factors like longevity in the market, while noteworthy, did not have a direct bearing on the state of the competitive market at any given point in time. The commission found that objective criteria, such as the required presence of several facilities-based providers, are more significant in demonstrating a healthy sustainable market, in that the actual presence of facilities-based providers demonstrates a greater commitment by those providers to remain in the market.

{¶ 29} R.C. 4927.03(A)(2)(d) enumerates factors to be considered by the commission. Those factors include "[o]ther indicators of market power, which may include market share, growth in market share, ease of entry, and the affiliation of providers of services." Ultimately, this is a factual determination. In essence, OCC is attempting to attack a factual determination by the commission. But OCC has failed to show that the commission's decision is unsupported by sufficient record evidence, and this court will not substitute its judgment for that of the commission. *Stephens v. Pub. Util. Comm.*, 102 Ohio St.3d 44, 2004-Ohio-1798, 806 N.E.2d 527, ¶ 16.

{¶ 30} The commission's approach to assessing competition recognizes the realities of the market by, for instance, requiring that the unaffiliated alternative providers be facilities-based. A facilities-based provider has a physical presence in the state and has invested in plant and equipment, which demonstrates a long-term commitment to stay in the market.

{¶ 31} Understanding of the current market is crucial to the analysis here. We defer to the commission's expertise in this regard. The commission complied with R.C. 4927.03(A)(2) by designing a test that, in its judgment, measures the extent of competition in the relevant market and made a factual finding based on the record and its expertise. We reject OCC's challenge to the commission's determinations.

## Access-Line Loss

{¶ 32} OCC's second proposition challenges the relevance of the applicant's access-line losses since 2002 as a prong of Test 4. This line-loss prong requires a showing that the applicant lost at least 15 percent of its residential access lines in each requested exchange since 2002.

{¶ 33} OCC questions the relevance of the line-loss provision to the statutory criteria in R.C. 4927.03(A). OCC argues that line loss establishes only that lines were lost, not that they were gained by a competitor.

{¶ 34} The commission discussed in its order the different factors it weighed in fashioning Test 4 and determining that lost lines should be a factor. It concluded that "a minimum 15 percent residential access line loss in a given exchange, considering all the possible causes for such loss, accompanied by the presence of at least five unaffiliated facilities-based alternative providers serving the residential market in that exchange, is sufficient to justify alternative regulation." Further, "[t]he line loss requirement measures market power, the level of competition that [an applicant] faces from alternative providers, and the availability of competing alternative services" in each exchange. Moreover, the commission found that the line-loss factor is practical and easily implemented, using readily available data. The commission also incorporated OCC's suggestion to move the time frame to count the lines lost from 1996 to 2002, which takes into account the migration of lines affiliated with the beginning of the unbundled network element platform offerings in Ohio. Finally, the commission concluded that the two factors in Test 4, when combined, "gauge[ ] the sustainability of competing residential providers in the subject market area."

{¶ 35} In H.B. 218, the General Assembly required the commission to develop rules to carry out the amendments. R.C. 4927.03(D). Those amendments include a requirement that the commission consider the regulatory treatment of competing and functionally equivalent services in determining the scope of regulation of services subject to commission jurisdiction. R.C. 4927.02(A)(6). The changes also require the commission to refrain from unduly favoring or disadvantaging any provider or any alternate provider of competing and functionally equivalent services. R.C. 4927.02(A)(7). Therefore, the commission had to interpret the statutory criteria and develop a method to evaluate competition beyond its regulatory authority.

{¶ 36} The commission's finding that Test 4 adequately judges alternative competition by combining two criteria, the presence of at least five unaffiliated facilities-based competitors and a significant loss of access lines, is reasonable. The test incorporates the market reality that there are some forms of competition that the commission has no power to regulate or formally review. The commission interpreted the intent of the General Assembly and developed a test to determine the level of competition and the availability of alternative providers regardless of regulatory oversight. This court may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

{¶ 37} Further, R.C. 4927.03(C) reserves to the commission the right to modify or abrogate an award of alternative regulatory treatment should any evidence

show that the findings relied upon are no longer valid. OCC can notify the commission if any conditions change.

{¶ 38} We affirm the commission's finding that Test 4 meets statutory requirements and that AT & T satisfied the line-loss portion of that test. Accordingly, we reject OCC's proposition of law.

### Barriers to Entry

{¶ 39} OCC's fourth proposition asserts that the commission's findings in this case and its administrative rules fail to comply with the requirements of R.C. 4927.03(A)(3), which prohibits an award of alternative regulation without a showing of a lack of barriers to entry for competitors offering stand-alone basic service.

{¶ 40} The commission established its view on the lack of barriers in the *05–1305* rulemaking case. The commission stated that all competitors seeking entry into a new market face difficulties, and the real issue is whether these difficulties can be overcome or whether barriers exist that actually prevent entry or significantly impede it, over and above those risks and costs normally associated with entering a new market.

{¶ 41} OCC asserts that the commission's view of what constitutes a "barrier" does not comport with the legislature's objective, as it effectively replaces the statutory phrase "no barriers to entry" with "no significant barriers to entry."

{¶ 42} The commission found that OCC's arguments on potential barriers to entry were fatally generic and lacking in any specific focus on any of the exchanges identified by AT & T in this proceeding. Moreover, the commission did not find any evidence in the record of any barriers to entry present in the requested exchanges that might bar providers from entering those markets. The commission found that the barriers pointed out by OCC in the *05–1305* rulemaking case are minimized by federal and state laws and rules. In addition, the commission found that OCC had failed to identify a single barrier to entry applying specifically to the relevant exchanges.

{¶ 43} We find that this issue involves another factual determination by the commission. The commission developed an independent test to assist it in making its factual determinations under the statute. The commission's rule for determining the presence of alternative providers and loss of access lines (i.e., loss of customers) is a reasonable method for establishing that there are no barriers preventing competition in the exchange.

{¶ 44} OCC's interpretation of the lack-of-barriers requirement would make alternative regulation impossible to achieve. No market is completely barrier-free. OCC's suggested test, which would require a finding that the market

presents no difficulties or risks for new entrants, would place the alternative regulation contemplated by the legislature virtually out of reach.

{¶ 45} In establishing Tests 3 and 4, the commission identified those factors that it believes are significant in complying with the intent of H.B. 218, while at the same time not making the test so demanding that alternative regulation as contemplated by H.B. 218 would be unattainable. H.B. 218 provided no definition of "barrier" and no criteria for finding a lack of barriers. We agree with the commission's conclusion that the legislature's criteria for granting alternative regulation was not as restrictive as OCC suggests and that "the ultimate decision-making authority regarding that implementation was left to the Commission." We are not persuaded that Tests 3 and 4 fail to properly address the absence of barriers to entry, and the commission's factual finding that AT & T provided sufficient evidence of a lack of barriers will not be disturbed by this court.

## Public Interest

{¶ 46} OCC argues in its sixth proposition that the commission granted alternative regulation in violation of R.C. 4927.03(A)(1), which requires a showing that such regulation is in the public interest. Prior to the statutory changes adding BLES to the eligible services for alternative regulation, the commission required telephone companies to make certain "public interest" commitments in order to receive an award of alternative regulation. OCC requested that AT & T be required to make additional commitments and asserts that the commission erred in failing to require additional commitments in the rules it promulgated under H.B. 218.

{¶ 47} The commission responded that in a competitive environment, further commitments are not appropriate, and the pressures imposed by market competition will work to the public's benefit by encouraging innovation, affordability, diversity of choice, and other consumer benefits.

{¶ 48} The commission reiterated its belief in the importance of ensuring that the largest numbers of residents have access to high-quality telephone service regardless of income or geographic location. But it also recognized the legislature's direction that market forces be allowed to create an environment that will promote competitive pricing, thereby maintaining just and reasonable rates. The commitments required of applicants for alternative regulation, set forth in Ohio Adm.Code 4901:1–4–06 et seq., represent the commission's attempt to strike a balance between regulation and free-market competition. We will not second-guess the commission by requiring it to extract commitments beyond those already imposed.

{¶ 49} R.C. 4927.02 requires the commission to consider the regulatory environment for competing services and to reduce the regulation of telephone

companies in the presence of increasing competition. The commission established its rules in accordance with the policy set forth in R.C. 4927.02(A) and determined that certain measures, such as annual rate caps, minimum access requirements for low-density areas, and economic assistance to eligible consumers, protected consumers without unduly interfering with the market and without disadvantaging local exchange carriers. The commission's position gives meaning to the H.B. 218 policy changes in R.C. 4927.02, which identifies the General Assembly's view of the public interest.

{¶ 50} Moreover, the public-benefit finding is a factual determination made by the commission. Its finding that AT & T met the requirements for a showing of public interest will not be disturbed by this court absent a demonstration that it is clearly unsupported by the record. *AT & T*, 88 Ohio St.3d at 555, 728 N.E.2d 371. OCC has made no such showing.

{¶ 51} Having considered them carefully, we affirm the commission's finding that AT & T's application is in the public interest and reject OCC's argument.

## CONCLUSION

{¶ 52} Ultimately, OCC is appealing the rules that the commission adopted to streamline its review for alternative treatment under the statute. The rules, as applied to the facts in this case, satisfy the statutory factors needed to award alternative treatment. The commission made appropriate factual determinations. OCC's arguments to the contrary are rejected, and the commission's order is affirmed.

Decision affirmed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Janine L. Migden–Ostrander, Consumers' Counsel, and David C. Bergmann and Terry L. Etter, Assistant Consumers' Counsel, for appellant.

Marc Dann, Attorney General, and Duane W. Luckey, William L. Wright, and Stephen A. Reilly, Assistant Attorneys General, for appellee.

Jon F. Kelly and Mary Ryan Fenlon, for intervening appellee, AT & T Ohio.