[Cite as *In re Application of Ormet Primary Aluminum Corp.,* 129 Ohio St.3d 9, 2011-Ohio-2377.]

IN RE APPLICATION OF ORMET PRIMARY ALUMINUM CORPORATION.

IN RE APPLICATION OF COLUMBUS SOUTHERN POWER COMPANY ET AL.

IN RE APPLICATION FOR ESTABLISHMENT OF A REASONABLE
ARRANGEMENT BETWEEN ERAMET MARIETTA, INC.
AND COLUMBUS SOUTHERN POWER COMPANY.

[Cite as *In re Application of Ormet Primary Aluminum Corp.,*
129 Ohio St.3d 9, 2011-Ohio-2377.]

*Public Utilities — R.C. 4905.31 — Establishment of special arrangements for particular customers.*

(Nos. 2009-2060, 2010-0722, and 2010-0723 — Submitted March 22, 2011 —
Decided May 24, 2011.)

APPEALS from the Public Utilities Commission, Nos. 09-119-EL-AEC,
09-1095-EL-RDR, and 09-516-EL-AEC.

_____

PFEIFER, J.

{¶ 1} Under R.C. 4905.31, the Public Utilities Commission may approve "reasonable arrangement[s]" between utilities and customers. Although the typical customer must take utility service under broadly applicable rates and tariffs, the reasonable-arrangement statute allows the commission to approve rates tailored to govern a specific customer's service. See R.C. 4905.31. In a pair of cases below, the commission approved reasonable arrangements between two American Electric Power operating companies, Columbus Southern Power Company and Ohio Power Company (collectively, "AEP"), and two southeastern Ohio manufacturing firms, Ormet Primary Aluminum Corporation ("Ormet") and Eramet Marietta, Inc. ("Eramet").

**{¶ 2}** Both arrangements gave the customer a substantial price discount on electric service. The commission approved the arrangements and allowed AEP to collect from other customers most of the revenue forgone to the discounts.

**{¶ 3}** The issues resolved below spanned three separate orders, and AEP appealed all three. We now consolidate the appeals and affirm the orders.

**Factual and Procedural Background**

**{¶ 4}** R.C. 4905.31 permits "reasonable arrangement[s]" between utilities and customers. Parties may propose for commission approval several types of arrangements, including "[a]ny * * * financial device that may be practicable or advantageous to the parties interested." R.C. 4905.31(E). These financial devices often take the form of negotiated rate schedules tailored to govern a specific utility-customer relationship. This case concerns separate applications filed by Ormet and Eramet to establish reasonable arrangements with AEP.

**{¶ 5}** The first applicant, Ormet, manufactures aluminum. It is the largest employer in Monroe County, employing around 1,000 people, and pays annual wages and salaries of over $56 million. Manufacturing aluminum consumes huge amounts of power, "up to 540 MW of electricity 24 hours per day, 365 days per year," according to Ormet's president. Ormet is the largest, most energy-intensive customer that AEP serves in Ohio.

**{¶ 6}** Electricity accounts for approximately 35 percent of the cost of producing aluminum. The price of aluminum is set globally on the London Metal Exchange, which means that Ormet cannot determine the selling price of its product. Accordingly, Ormet is vulnerable when the price of aluminum fails to keep pace with the price of power. In the past decade, Ormet has gone through bankruptcy reorganization and has shut down and restarted its Monroe County operations.

{¶ 7} In February 2009, Ormet asked the commission to approve a reasonable arrangement linking Ormet's electric rate to the market price of aluminum. When the price of aluminum was at a certain benchmark, Ormet was to pay a set rate for power. If the price of aluminum fell below the benchmark, Ormet would get a discount on power; if the price of aluminum was above the benchmark, Ormet would pay a premium.

{¶ 8} Eramet filed its application four months after Ormet. Eramet described its products as "manganese alloys that strengthen and improve the properties of steel." Its application was much simpler than Ormet's. It asked for a fixed, discounted rate to fund certain upgrades to its Marietta manufacturing facilities.

{¶ 9} The amount of the discounts is the difference between what AEP would have collected under its tariffs and what it actually collects under the discounts and is known as "delta revenue." See, e.g., Ohio Adm.Code 4901:1-38-01(C). A recent amendment to R.C. 4905.31 addresses delta revenue, stating that a reasonable arrangement "may include a device to recover costs incurred in conjunction with any economic development and job retention program of the utility within its certified territory, including recovery of revenue foregone as a result of any such program." See 2008 Am.Sub.S.B. No. 221. AEP understood this language to mean that the commission could approve an application only if the application allowed AEP to collect from other customers all of the resulting delta revenue.

{¶ 10} The commission held hearings in both cases. Numerous parties intervened, including the Office of the Ohio Consumers' Counsel ("OCC") and Industrial Energy Users–Ohio ("IEU"). Disagreement in both cases substantially centered on the amount of the discount and who should pay for it.

{¶ 11} The commission issued the *Ormet* order on July 15, 2009, and the *Eramet* order on October 15, 2009. In both cases, the commission approved the

basic discount mechanism and, as a condition of receiving the discount, required the manufacturers to maintain certain employment levels. The orders allowed AEP to recover most of its delta revenue from other customers, but it did not allow AEP to continue to receive provider-of-last-resort ("POLR") charges that are typically paid by the manufacturers.

{¶ 12} AEP sought rehearing in both cases, which the commission denied. Several months after the original orders, in a third proceeding, the commission authorized AEP to collect the Ormet and Eramet delta revenue, again, without allowing recovery of POLR charges. AEP appealed all three cases. Ormet and Eramet have intervened in their respective appeals; OCC and IEU have intervened in all three. All intervenors have filed briefs in support of the commission.

{¶ 13} Because the three appeals present nearly identical issues, we consolidated the cases for oral argument. We now consolidate the cases for decision.

**Analysis**

{¶ 14} As permitted by R.C. 4905.31, Ormet and Eramet each asked the commission to approve a reasonable arrangement that included a substantial discount on power; the commission approved the arrangements. The orders of the commission allow AEP to collect the delta revenue from other customers. The one exception is that the commission did not allow AEP to collect the amount for POLR charges that are typically paid by the manufacturers. AEP has contended throughout the proceedings that other customers should pay in full for the discount.

{¶ 15} Leaving aside for the moment AEP's specific challenges to the orders, the commission's decision to disallow POLR charges makes sense. POLR charges compensate utilities for standing ready to serve "customers who shop and then return." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 39, fn. 5. Under the orders, however,

Ormet and Eramet cannot shop. In short, AEP seeks payment of millions of dollars a year to prepare for the return of two customers even though those two customers cannot lawfully depart. We conclude that the commission's decision was sensible. We now address each of AEP's arguments in turn.

*"May" is permissive*

{¶ 16} AEP first argues that the commission erred "in concluding that 'the recovery of delta revenues is a matter for the Commission's discretion' under R.C. 4905.31." We disagree. R.C. 4905.31 does not require full recovery of delta revenue. The statute clearly contemplates "recovery of revenue foregone" as a result of discounts, but it speaks only in permissive terms. It states that certain arrangements "may include a device to recover costs incurred in conjunction with any economic development and job retention program of the utility within its certified territory, including recovery of revenue foregone as a result of any such program." R.C. 4905.31(E).

{¶ 17} The statute states that delta revenue "may" be recovered. We conclude that recovery is permitted but not required. See *Fayetteville Tel. Co. v. Pub. Util. Comm.* (1982), 1 Ohio St.3d 167, 170, 1 OBR 199, 438 N.E.2d 128, fn. 8. See also *State ex rel. Niles v. Bernard* (1978), 53 Ohio St.2d 31, 34, 7 O.O.3d 119, 372 N.E.2d 339 ("usage of the term 'may' is generally construed to render optional, permissive, or discretionary the provision in which it is embodied"). Not only does the statute use the permissive term "may," it does not use any mandatory terms, such as "must" or "shall," when addressing the commission's authority to allow the recovery of delta revenue. Because R.C. 4905.31(E) uses permissive language in describing whether forgone revenue should be recovered, it is a matter for the commission's discretion.

{¶ 18} AEP's primary argument is that the permissive words in R.C. 4905.31 cannot be directly applied to the cost-recovery language. AEP contends that because no permissive words immediately precede "including recovery of

revenue foregone" in the statute, recovery of delta revenue must be mandatory. But no mandatory language immediately precedes "including recovery of revenue foregone" either. Furthermore, the earlier "may" naturally relates to the entire sentence. AEP's own choice of words confirms the difficulty of characterizing R.C. 4905.31(E) as mandatory—AEP uses forms of the word "permit" no fewer than nine times to describe the relevant provisions of the statute. Indeed, it concludes its statutory argument with the statement that "the General Assembly's manifest intention [was] to *permit* recovery of economic development costs 'including revenue foregone.' " (Emphasis added.) We agree—but fail to see how this furthers AEP's cause.

{¶ 19} AEP also asserts that if the orders are allowed to stand, the commission "could disallow recovery of all revenues foregone under a contract filed unilaterally by a mercantile customer and imposed on the utility by the Commission." But this case does not present that question. As AEP acknowledges in *Ormet* (and does not gainsay in *Eramet*), the commission granted AEP "the majority of the revenues foregone." Whether the commission could lawfully deny all forgone revenue is a hypothetical question, and we will not pass on it here. See, e.g., *State ex rel. Elyria Foundry Co. v. Indus. Comm.* (1998), 82 Ohio St.3d 88, 89, 694 N.E.2d 459.

{¶ 20} Finally, AEP devoted nine pages of its brief to explaining how the commission had decided AEP's electric-security-plan case, suggesting that the decisions in that case and this one are inconsistent. AEP cites no authority and presents no argument suggesting that any inconsistency between the two orders constitutes an independent legal error. We fail to see the relationship between the two cases, and accordingly, we do not consider the matter.

{¶ 21} AEP has not shown that R.C. 4905.31 requires full recovery of delta revenue. We reject its first proposition of law.

*Exclusive-supplier provisions do not violate public policy*

**{¶ 22}** Even though AEP argues to the contrary, the orders issued by the commission do not allow the manufacturers to shop for electric service for the duration of the arrangement. In *Eramet*, AEP argues that there is no evidence that the manufacturer agreed to the exclusive-supplier provision. (No such argument is made in *Ormet*.) The order stated that "Eramet cannot shop," and Eramet did not appeal any part of the order. Thus, Eramet is now bound by the order. Further, Eramet represents to this court that "there is an exclusive supplier agreement," and we accept its representation. In its second proposition of law, AEP argues that these exclusive-supplier provisions violate Ohio's "basic and central" electric policies: namely, those favoring the development of competitive markets, retail shopping, and customer choice. For that reason, AEP asks us to reverse or vacate the adoption of the exclusive-supplier provisions.

**{¶ 23}** In response, OCC argues that the state policies of R.C. Chapter 4928 do not apply to reasonable arrangements approved under R.C. 4905.31. See R.C. 4905.31 ("Chapter[] * * * 4928 * * * do[es] not prohibit" the formation of "any reasonable arrangement"). We will assume for the sake of argument that the policy statutes apply here, because even if they do, AEP has not shown that the commission violated them. According to AEP, the exclusive-supplier provisions conflict with the policies in favor of "customer choice," "the right to shop," and "retail choice." But the order advanced the choices of the only customers who were party to these proceedings. The customers, after all, proposed the arrangements, supported them before the commission, and have intervened to defend them on appeal. Customer choice appears to have been vindicated in these cases.

**{¶ 24}** Nevertheless, AEP responds, allowing Ormet and Eramet to tie up their accounts might harm the larger competitive market, contrary to state policy. The company suggests that expert testimony is not necessary to show harm to Ohio markets, but we find that assertion dubious. Whether and to what extent the

removal of one or two large customers would adversely affect the entire competitive market is the sort of matter to which economists and other market experts could attest. It is a question of fact, but no evidence was provided, and we will not reverse the commission based on speculation. See, e.g., *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 67. We reject AEP's second proposition of law.

*Can Ormet or Eramet shop for competitive generation?*

{¶ 25} In its third proposition of law, AEP asserts that the commission erred when it found that there was "no risk" that the customers "will shop for competitive generation and then return to AEP-Ohio's POLR service." This finding underpinned the commission's decision to disallow POLR charges. AEP asks us to "reverse the Commission's conclusion that there is no risk that [the customers] will shop and subsequently return to SSO service from AEP Ohio."

{¶ 26} AEP challenges a factual finding, so our review is deferential. See *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 117 Ohio St.3d 301, 2008-Ohio-861, 883 N.E.2d 1035, ¶ 14. We cannot say that the commission erred in finding that there was no risk that the manufacturers would shop. The commission relied on the fact that "AEP-Ohio will be the exclusive supplier" to the manufacturers. As we have already discussed, that is true—the orders require the customers to take service exclusively from AEP. If they must take service exclusively from AEP, then it follows that they cannot take it from another supplier. Thus, the commission reasonably found that the risk of shopping was insufficient to justify the collection of POLR charges.

{¶ 27} AEP maintains that there is some risk that Ormet or Eramet could shop despite the orders, given the commission's continuing supervisory power over reasonable arrangements. We consider this issue unripe. If the commission allows Ormet or Eramet to shop, if that harms AEP, and if the commission fails to

8

make AEP whole, AEP may protest before the commission and then appeal to this court if it remains dissatisfied.

{¶ 28} Finally, AEP argues that the commission unreasonably "narrow[ed] the scope of its review" of the risk that manufacturers would shop "to only three years of the 10-year contract." AEP did not apply for rehearing on this ground in the *Ormet* case, so we lack jurisdiction to consider the issue. *Consumers' Counsel v. Pub. Util. Comm.* (1994), 70 Ohio St.3d 244, 247, 638 N.E.2d 550. AEP preserved this challenge in *Eramet*, but it lacks merit. Limiting review of shopping risk to three years was reasonable. The POLR charge was to expire after three years, and no determination had been made whether it would be renewed. Recovery of the POLR charge was the only disputed issue in *Eramet*, so the commission sensibly limited its review to the period in which that charge was in effect.

*Must a utility consent to a reasonable arrangement?*

{¶ 29} In its fourth and final proposition of law, AEP argues that "there can be no arrangement approved by the Commission if the public utility to be bound by the arrangement does not agree to its terms." The statute does not expressly require the utility's consent to a reasonable arrangement. AEP attempts to locate this requirement in two places: the word "arrangement" and the phrase "practicable or advantageous to the parties interested."

{¶ 30} AEP's primary argument is that the term "arrangement" denotes a contract to which both parties assent. The argument assumes that "arrangement" means one of only two things: "either a '*mutual* agreement or understanding' or 'a preliminary step or measure' " (emphasis added by AEP), quoting Webster's Third New International Dictionary (2002) 120. As the second meaning does not work, AEP concludes, arrangement must mean "mutual agreement."

{¶ 31} We are not persuaded, because the major premise of the argument is false. The word "arrangement" has more than two possible definitions.

Webster's Third gives seven main senses, and AEP's preferred definition is the only one denoting any sense of mutual assent. See id., sense 6(b)(1). Many of the definitions that AEP neglected to mention fit in the context before us, including the first, which is "the act or action of arranging or putting in correct, convenient, or desired order." Id. A rate schedule may be "arranged," i.e., put in a desired order, so that sense also works in this context. See, e.g., *Atchison, Topeka & Santa Fe Ry. Co. v. United States* (1914), 232 U.S. 199, 221, 34 S.Ct. 291, 58 L.Ed. 568 (stating that the commerce commission "may prescribe the form in which schedules shall be prepared and arranged"). This sense of the word "arrangement" contains no element of mutual assent. Thus, "arrangement" by itself does not impose a requirement of utility consent.

{¶ 32} At most, AEP has shown that "arrangement" could mean "mutual agreement." But the question is not what "arrangement" could mean in isolation, but what R.C. 4905.31 as a whole requires. See, e.g., *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 12 ("Parsing individual words is useful only within a context"). Reading the statute as a whole, we discern no support for AEP's position.

{¶ 33} First, as may be inferred from AEP's exertions, the statute does not expressly require the consent or agreement of the utility. For the General Assembly to choose a word that usually does not denote mutual consent would be an odd and exceedingly subtle way for the General Assembly to impose a mutual-consent requirement.

{¶ 34} Second, although R.C. 4905.31 does not expressly require utility consent, it expressly requires utility compliance. The statute states, "No * * * arrangement is lawful unless it is filed with and approved by the commission." Subsection (E). The next sentence then commands the utility "to conform its schedules of rates, tolls, and charges to such arrangement"—that is, the commission-approved arrangement. Rather than giving utilities the right to

cancel or consent, the statute requires utilities to conform to the approved arrangement.

{¶ 35} Third, the fact that R.C. 4905.31 now allows the customer to propose an arrangement undercuts the notion that the utility must agree to the terms. Before recent amendments to R.C. 4905.31, see 2008 Am.Sub.S.B. No. 221, only utilities could file reasonable arrangements for commission approval. This meant that utilities possessed a de facto veto power. If they did not like the terms of the arrangement, they could refuse to file. That the statute was amended to allow nonutilities to file arrangements further suggests that AEP's consent is not required.

{¶ 36} Finally, the statute affirmatively gives the commission—not utilities—final say over arrangements. The final sentence of R.C. 4905.31 states, "Every * * * reasonable arrangement shall be under the supervision and regulation of the commission, and is subject to change, alteration, or modification by the commission." Thus, the commission may supervise, regulate, change, alter, and modify arrangements. No comparable power is vested in the utility, and the power to modify is not conditioned on the agreement of the utility.

{¶ 37} Taking these factors together, we cannot read the word "arrangement" to impose a utility-consent requirement.

{¶ 38} AEP asserts that one other part of the statute requires its consent to the final order. As noted, R.C. 4905.31(E) permits "financial device[s] that may be practicable or advantageous to the parties interested." According to AEP, the phrase "advantageous to the parties" means that all parties must agree that the device is advantageous. We disagree. Even assuming that the phrase "practicable or advantageous to the parties interested" acts as a limit upon the commission, the General Assembly used the disjunctive term "or." Thus, even under AEP's reading of the statute, an arrangement need only be "practicable" to survive. "Practicable" means "reasonably capable of being accomplished; feasible."

Black's Law Dictionary (9th Ed.2009) 1291. AEP has made no showing that this arrangement is infeasible. Indeed, the commission required other customers to pay all of AEP's forgone revenue, except for the POLR charge, and AEP has not demonstrated that it will actually expend anything to act as provider of last resort for these customers.

### Conclusion

{¶ 39} For the foregoing reasons, we affirm the orders of the commission.

Orders affirmed.

O'CONNOR, C.J., and LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Steven T. Nourse and Matthew J. Satterwhite, for appellants, Columbus Southern Power Company and Ohio Power Company.

Michael DeWine, Attorney General, William L. Wright, Section Chief, and Thomas McNamee, Werner L. Margard III, and Thomas G. Lindgren, Assistant Attorneys General, for appellee, Public Utilities Commission of Ohio.

Janine L. Migden-Ostrander, Consumers' Counsel, and Maureen R. Grady, Melissa R. Yost, and Michael E. Idzkowski, Assistant Consumers' Counsel, for intervening appellee Ohio Consumers' Counsel.

Boehm, Kuntz & Lowry, David F. Boehm, and Michael L. Kuntz, for intervening appellee Ohio Energy Group.

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, and Joseph E. Oliker, for intervening appellees Industrial Energy Users–Ohio and Eramet Marietta, Inc.

Sonnenschein, Nath & Rosenthal, L.L.P., Clinton A. Vince, Douglas G. Bonner, Daniel D. Barnowski, Emma F. Hand, and Keith C. Nusbaum, for intervening appellee Ormet Primary Aluminum Corporation.

_____