[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Power Co.,* Slip Opinion No. 2018-Ohio-4698.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-4698

IN RE APPLICATION SEEKING APPROVAL OF OHIO POWER COMPANY'S PROPOSAL TO ENTER INTO AN AFFILIATE POWER PURCHASE AGREEMENT FOR INCLUSION IN THE POWER PURCHASE AGREEMENT RIDER; OFFICE OF OHIO CONSUMERS' COUNSEL ET AL., APPELLANTS; OHIO POWER COMPANY, INTERVENING APPELLEE; PUBLIC UTILITIES COMMISSION, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Ohio Power Co.,* Slip Opinion No. 2018-Ohio-4698.]

*Public utilities—Electric-security plan—Application to recover costs under a power-purchase-agreement rider—Under R.C. 4928.143, utility may include charges in electric-security plan that are otherwise prohibited by R.C. Title 49—R.C. 4928.143(B)(2)(d) allows financial limitations on customer shopping for retail electric-generation service—Public Utilities Commission properly conduct test under R.C. 4928.143(C)(1) for approving an electric-security plan—Commission's order affirmed.*

(No. 2017-0752—Submitted June 26, 2018—Decided November 27, 2018.)

APPEAL from the Public Utilities Commission,

Nos. 14-1693-EL-RDR and 14-1694-EL-AAM.

_____

**O'CONNOR, C.J.**

{¶ 1} In early 2015, the Public Utilities Commission issued an order that approved a charge referred to as the Power Purchase Agreement Rider ("PPA Rider") as a component of intervening appellee Ohio Power Company's third electric-security plan ("ESP"). In its order in that proceeding (the "ESP case"), the commission did not allow the company to recover any costs through the PPA Rider at that time; it approved the PPA Rider only as a placeholder with a rate of zero. In a separate proceeding, the commission permitted Ohio Power to recover costs through the PPA Rider (the "PPA Rider case"). The commission's order approving cost recovery modified and adopted a joint stipulation submitted by several parties, including Ohio Power and the staff of the commission.

{¶ 2} The Office of the Ohio Consumers' Counsel ("OCC") and the Ohio Manufacturers' Association Energy Group ("OMAEG") filed this appeal of the commission's order in the PPA Rider case, challenging the approval of the cost recovery through the PPA Rider. For the reasons that follow, we affirm the commission's order.

## I. FACTS AND PROCEDURAL HISTORY

### A. The ESP Case

{¶ 3} On February 25, 2015, the commission approved Ohio Power's third ESP. As part of that ESP, the commission authorized the PPA Rider. Pub. Util. Comm. No. 13-2385-EL-SSO (Feb. 25, 2015) ("ESP Order"). As originally proposed, the PPA Rider was based on Ohio Power's agreement to purchase power from the Ohio Valley Electric Corporation ("OVEC"). The intended purpose of the

rider was to provide a financial hedge against fluctuating prices in the wholesale-power market in order to stabilize retail-customer rates.

{¶ 4} The PPA Rider works as either a charge or a credit to Ohio Power's retail customers, depending on how OVEC's costs compare to the market rate. PJM Interconnection ("PJM") operates a competitive wholesale electricity market where rates are set.[1] If the revenue generated from sales to the PJM market is lower than the costs of the power, Ohio Power's customers would pay a surcharge to Ohio Power through the PPA Rider to make up the difference. But if the PJM market rates are higher than the power costs, customers would receive a credit through the PPA Rider. According to Ohio Power, OVEC's costs are relatively stable in comparison to the wholesale-power market, and they rise and fall in a manner that is countercyclical to the market, thereby creating a hedge for ratepayers.

{¶ 5} Although the commission approved the PPA Rider mechanism in the ESP case, it refused to allow Ohio Power to recover any costs through the rider. The PPA Rider was approved only as a placeholder rider with the rate set at zero. In order to recover costs under the PPA Rider, Ohio Power was required to demonstrate its entitlement to the recovery of costs in this subsequent proceeding.

### B. The PPA Rider Case

{¶ 6} On May 15, 2015, Ohio Power filed an application in the underlying PPA Rider case—a separate proceeding from the ESP case—to recover costs from customers through the PPA Rider. In 2016, the commission issued an order that modified and then adopted a joint stipulation allowing Ohio Power to do so. Pub. Util. Comm. No. 14-1693-EL-RDR (Mar. 31, 2016) ("PPA Order"). The commission's order also changed the content of the PPA Rider that had been approved in the ESP case. At Ohio Power's request, the commission allowed a

---

[1] PJM Interconnection is a multiutility regional transmission organization designated by the Federal Energy Regulatory Commission to coordinate the movement of wholesale electricity in all or part of 13 states—including Ohio—and the District of Columbia.

power-purchase agreement between Ohio Power and the company's affiliate-owned power plants to be included in the rider in addition to the OVEC power-purchase agreement that had originally been authorized under the ESP.

{¶ 7} Ohio Power later asked the commission for approval to withdraw the affiliate power-purchase agreement and return to an OVEC-only PPA Rider. Ohio Power's request to withdraw the affiliate PPA was prompted by an April 2016 decision of the Federal Energy Regulatory Commission ("FERC"). The FERC's order rescinded a waiver that Ohio Power had previously been granted allowing it to purchase power from its affiliates. *Electric Power Supply Assn. v. AEP Generation Resources*, 155 F.E.R.C. ¶ 61,102 (Apr. 27, 2016). The commission granted Ohio Power's request.

{¶ 8} After additional rounds of rehearing, the commission issued a final, appealable order on April 5, 2017. OCC and OMAEG then filed this appeal, challenging the commission's decision to allow cost recovery through the OVEC-only PPA Rider.

## II. STANDARD OF REVIEW

{¶ 9} "R.C. 4903.13 provides that a [commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. An appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id.* We review

questions of law de novo. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 38 Ohio St.3d 266, 268-269, 527 N.E.2d 777 (1988).

### III. ANALYSIS

#### A. *Joint Motion to Supplement the Record*

{¶ 10} Before reaching the merits, we first address OCC and OMAEG's joint motion to supplement the record on appeal. OCC and OMAEG seek to supplement the record with documents that were filed with the commission in the underlying docket after the commission had transferred the record to this court. Ohio Power and the commission oppose the motion.

{¶ 11} OCC and OMAEG filed their joint motion to supplement the record pursuant to S.Ct.Prac.R. 15.08, which provides that we may "direct that a supplemental record be certified and transmitted to the Clerk" if "any part of the record is not transmitted to the Supreme Court but is necessary" for us to consider the questions presented on appeal. We need not evaluate whether the documents in question are "part of the record" that was "not transmitted to the Supreme Court," because OCC and OMAEG have not shown that the information is necessary for us to decide the issues presented in this appeal. OCC and OMAEG do not even make an argument that the documents in question are necessary. Rather, they allege only that "[t]he information is *relevant* to the issues appealed." (Emphasis added.) Assuming without deciding that the rule applies, this is insufficient to meet the necessity requirement in S.Ct.Prac.R. 15.08. Therefore, we deny the joint motion to supplement the record.

#### B. *The Merits of the Appeal*

{¶ 12} As to the merits, OCC and OMAEG have raised several propositions of law, each containing several subparts. The arguments are grouped together when appropriate for ease of discussion.

**1.** *OCC Proposition of Law No. 1 and OMAEG Proposition of Law No. 2, Section (B)*: **Whether the PPA Rider recovers unlawful transition revenue in violation of R.C. 4928.38 and 4928.141(A)**

{¶ 13} OCC and OMAEG claim that the commission erred when it found that the PPA Rider did not recover unlawful transition revenue or its equivalent. According to appellants, transition revenue was designed to subsidize the electric utility's generation service during the transition to a competitive generation market, but those revenues are no longer authorized under R.C. 4928.38 and 4928.141(A). They maintain that because the PPA Rider allows Ohio Power to recover generation revenue from ratepayers that the utility cannot otherwise recover in the competitive generation market, the rider is unlawful.

{¶ 14} The commission found that the PPA Rider does not permit Ohio Power to recover unlawful transition revenue because it "constitutes a rate stability charge related to limitations on customer shopping for retail electric generation service and may, therefore, be authorized pursuant to R.C. 4928.143(B)(2)(d)." Pub.Util.Comm. Nos. 14-1693-EL-RDR and 14-1694-EL-AAM (Mar. 31, 2016), at 102.

{¶ 15} On rehearing, the commission offered two additional reasons why Ohio Power is not recovering unlawful transition revenue through the PPA Rider. First, the commission found that the PPA Rider does not recover costs incurred under regulated rates that are no longer recoverable under market rates, meaning the costs would not fit within the requirement for transition costs in R.C. 4928.39(C) (transition costs must be "unrecoverable in a competitive market"). Second, the commission found that the OVEC contract did not meet the requirements for allowable transition costs in R.C. 4928.39(B) (transition costs must, among other things, be directly assignable or allocable to the provision of retail generation service to consumers in Ohio) and 4928.39(D) (transition costs must be costs the utility "would otherwise be entitled an opportunity to recover").

**{¶ 16}** For the reasons that follow, we affirm the commission's finding on this issue, albeit for different reasons than those cited in the commission's orders.

*a. R.C. 4928.143(B) exempts utilities from prohibitions on charges in an ESP contained in other provisions of R.C. Title 49*

**{¶ 17}** Ohio Power and the commission argue that even if the PPA Rider collects unlawful transition revenue, the rider is lawful under R.C. 4928.143(B), which provides that an ESP may include a charge, "[n]otwithstanding any other provision of Title XLIX of the Revised Code to the contrary." According to Ohio Power and the commission, the "notwithstanding" clause allows a utility to include charges in an ESP that may otherwise be prohibited by other sections of R.C. Title 49. We agree.

**{¶ 18}** The analysis must begin with the language of the statute. *In re Application of Ohio Power Co.*, 140 Ohio St.3d 509, 2014-Ohio-4271, 20 N.E.3d 699, ¶ 20. The PPA Rider was approved under R.C. 4928.143(B)(2), which provides:

> (B) Notwithstanding any other provision of Title XLIX of the Revised Code to the contrary except division (D) of this section, divisions (I), (J), and (K) of section 4928.20, division (E) of section 4928.64, and section 4928.69 of the Revised Code:
>
> * * *
>
> (2) The plan may provide for or include, without limitation, [nine different provisions, as set out in subparagraphs (a) through (i).]

**{¶ 19}** We read the "notwithstanding" clause of R.C. 4928.143(B) as allowing an ESP to include items that R.C. Title 49 would otherwise prohibit. This provision expressly states that with certain listed exceptions, any contrary provision

of R.C. Title 49 does not apply to an ESP. So even though R.C. 4928.38 bars transition revenue, the "notwithstanding" clause renders R.C. 4928.38 inapplicable if the revenues are recoverable as one of the nine types of provisions listed in R.C. 4928.143(B)(2). Because, as we discuss below, the PPA Rider constitutes one of those types of provisions—specifically, a limitation on customer shopping under R.C. 4928.143(B)(2)(d)—it is permissible even if it otherwise could be deemed to constitute transition revenue.

### b. The counterarguments of OCC and OMAEG are not persuasive

{¶ 20} OCC and OMAEG argue that R.C. 4928.143(B) does not provide an exception to the prohibition against collecting transition revenue. We disagree.

{¶ 21} OCC argues that the commission's and Ohio Power's reading of the notwithstanding clause conflicts with R.C. 4928.141(A). According to OCC, the General Assembly enacted R.C. 4928.141(A) to continue to prohibit the collection of transition revenues in a standard service offer beyond the market-development period. OCC, however, misreads R.C. 4928.141(A).

{¶ 22} R.C. 4928.141(A), enacted as part of 2008 Am.Sub.S.B. No. 221 ("S.B. 221"), requires electric-distribution utilities to make a standard service offer of generation service to consumers in one of two ways: through a "market rate offer" under R.C. 4928.142 or an ESP under R.C. 4928.143. R.C. 4928.141(A) also provides that if a new standard service offer was not approved by January 1, 2009, the prior rate plan would remain in effect "until a standard service offer is first authorized under section 4928.142 or 4928.143 of the Revised Code" and in the event a "rate plan extends beyond December 31, 2008, * * * for the duration of the [rate] plan's term." *See* R.C. 4928.01(A)(33) (defining "rate plan" as "the standard service offer in effect on the effective date of the amendment of this section by S.B. 221 of the 127th general assembly, July 31, 2008"). Finally, R.C. 4928.141(A) provides that a standard service offer made through an ESP "shall exclude any previously authorized allowances for transition costs, with such

exclusion being effective on and after the date that the allowance is scheduled to end under the utility's rate plan."

{¶ 23} OCC relies on this last sentence to assert that R.C. 4928.141(A) prohibits the recovery of transition revenues in a standard service offer made through an ESP. That reliance is misplaced. This provision is limited to "previously authorized" transition costs, i.e., transition costs that had been approved under the rate plan in effect when S.B. 221 became effective. *See* R.C. 4928.01(A)(33). Because the costs at issue here do not fall under the category of "previously authorized allowances for transition costs," the provision is inapplicable.

{¶ 24} OMAEG argues that because the commission did not rely on the "notwithstanding" clause, R.C. 4903.09 precludes reliance on it in this appeal. OMAEG is correct that the commission did not address the notwithstanding clause, even though Ohio Power raised the clause as a defense below. Even so, OMAEG's reliance on R.C. 4903.09 is misplaced. This statute requires the commission to set forth the reasons for its decisions and prohibits summary rulings and conclusions that do not develop the supporting rationale or record. *Indus. Energy Users-Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30. R.C. 4903.09 therefore imposes requirements on the commission, not this court, and it does not prohibit us from upholding a commission order on grounds other than those cited by the commission.

## 2. Challenges to the commission's approval of the PPA Rider under the ESP statute, R.C. 4928.143

{¶ 25} OCC raises several arguments that the commission failed to comply with R.C. 4928.143 when it allowed Ohio Power to recover costs under the PPA Rider. We find that none has merit.

*a.* OCC Proposition of Law No. 2*: Whether the PPA Rider complies with R.C. 4928.143(B)(2)(d)*

{¶ 26} In its ESP application, Ohio Power sought approval of the PPA Rider under R.C. 4928.143(B)(2)(d). This section states that an ESP may include the following:

> Terms, conditions, or charges relating to limitations on customer shopping for retail electric generation service, bypassability, standby, back-up, or supplemental power service, default service, carrying costs, amortizations periods, and accounting or deferrals, including future recovery of such deferrals, as would have the effect of stabilizing or providing certainty regarding retail electric service.

Thus, if a proposed item in an ESP meets the following three criteria, it is lawful: (1) it is a term, condition, or charge, (2) it relates to one of the limited set of listed items (e.g., limitations on customer shopping, bypassability, or carrying costs), and (3) it has the effect of stabilizing or providing certainty regarding retail electric service. The commission found that the PPA Rider was authorized under this section as a charge that acts as a financial limitation on customer shopping for retail electric-generation service, promotes stable retail electric service prices, and ensures customer certainty regarding retail electric service.

{¶ 27} OCC challenges only the commission's determination that the PPA Rider relates to limitations on customer shopping for retail electric service.

(1) *OCC Proposition of Law No. 2, Section (B)(1):* Whether R.C. 4928.143(B)(2)(d) allows for *financial* limitations on customer shopping

{¶ 28} OCC first argues that the commission erred when it inserted the word "financial" at the beginning of the phrase "limitations on customer shopping for

10

retail electric service." According to OCC, only "physical" limitations on customer shopping are allowed and the commission distorted the General Assembly's intent by adding the word "financial" to R.C. 4928.143(B)(2)(d).

{¶ 29} Because OCC raises an issue of statutory interpretation, our analysis must begin with the language of the statute. *See Ohio Power Co.*, 140 Ohio St.3d 509, 2014-Ohio-4271, 20 N.E.3d 699, at ¶ 20. R.C. 4928.143(B)(2)(d) allows the commission to approve a charge "relating to limitations on customer shopping for retail electric generation service." The statute does not speak to the type of limitations on customer shopping that are allowed. Nor does it otherwise restrict the commission's determination. The plain language of the statute simply permits the commission to approve "limitations on customer shopping." Because a financial limitation is a type of limitation on customer shopping, we reject this argument.

(2) *OCC Proposition of Law No. 2, Section (B)(2):* Whether the commission erred in not focusing on the meaning of "customer shopping"

{¶ 30} OCC next argues that the commission wrongly focused on the word "limitation" to determine the plain meaning of R.C. 4928.143(B)(2)(d). OCC contends that the commission instead should have focused on the meaning of the phrase "customer shopping." OCC maintains that precedents from this court and the commission commonly use the term "customer shopping" synonymously with "customer switching." As OCC reads it, that common usage dictates that the term "customer shopping" in R.C. 4928.143(B)(2)(d) refers to customers who physically "switch" from buying retail generation service from the electric distribution utility to a competitive retail provider.

{¶ 31} The gravamen of OCC's claim is that the phrase "limitations on customer shopping" allows only a provision that limits customers from physically switching to competitive generation suppliers. We need not decide whether that interpretation is correct, however, because even if OCC is correct, this would not

preclude the use of a financial limitation as a means to restrict customers from physically switching. As discussed, the plain language of R.C. 4928.143(B)(2)(d) does not forbid a "financial" limitation.

{¶ 32} Therefore, we reject OCC's second proposition of law.

*b.* OCC Proposition of Law No. 4*: Whether the commission properly conducted the statutory test for approving an ESP under R.C. 4928.143(C)(1)*

{¶ 33} OCC argues under proposition of law No. 4 that the commission improperly applied the statutory test for approving an ESP. R.C. 4928.143(C)(1) requires the commission to approve an ESP if it is "more favorable in the aggregate" than the expected result of a "market rate offer." The statute, however, "does not bind the commission to a strict price comparison." *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 402, 2011-Ohio-958, 945 N.E.2d 501, ¶ 27. Instead, "in evaluating the favorability of a plan, the statute instructs the commission to consider 'pricing and all other terms and conditions.' " (Emphasis deleted.) *Id*., quoting R.C. 4928.143(C)(1).

{¶ 34} Consistent with this provision, the commission conducted the test in the ESP case, evaluating (1) the pricing of the ESP and the expected market-rate offer, (2) other quantifiable terms of the ESP, and (3) certain nonquantifiable factors. At the request of certain parties, the commission conducted the statutory test a second time in the subsequent PPA Rider case, which led to its determination to allow Ohio Power to recover costs under the PPA Rider.

{¶ 35} OCC challenges the manner in which the commission weighed the ESP against the market-rate offer in the PPA Rider case. According to OCC, the commission failed to consider certain costs collected under the PPA Rider, as well as costs imposed through other riders, when evaluating the proposed ESP against the expected market rate offer.

(1) *OCC Proposition of Law No. 4, Section (B)(1)*: Whether the commission failed to consider the cost of renewable energy projects when evaluating the PPA Rider under the statutory test

**{¶ 36}** OCC first argues that the commission erred when it refused to consider the costs of certain renewable energy projects in conducting the statutory test. The commission had previously authorized Ohio Power to develop 900 megawatts of renewable energy projects in the four years following the adoption of the stipulation in this case and also to recover the costs of those resources through the PPA Rider. OCC maintains that these "costs were expected to be collected from customers during the ESP," so they should have been considered when evaluating the ESP under R.C. 4928.143(C)(1).

**{¶ 37}** We see no error in the commission's decision on this point. The commission explained that it did not consider these costs under the statutory test because no renewable project costs were being recovered during the period covered by this ESP. The renewable energy projects at issue were to be developed in the future and the commission would determine any cost recovery in Ohio Power's next ESP case. As for OCC's claim that "costs were expected to be collected from customers during the ESP," it offers no evidence to support that assertion. We therefore reject OCC's argument on this point.

(2) *OCC Proposition of Law No. 4, Sections (B)(2) and (C)*: Whether the commission failed to consider the costs of other stipulation proposals in conducting the statutory test

**{¶ 38}** OCC next argues that the commission failed to consider the costs of several other provisions in the stipulation when it conducted the ESP versus market-rate-offer test. The commission rejected OCC's argument on rehearing, finding OCC's arguments premature because the challenged costs had not yet been approved for recovery and were to be reviewed in future proceedings. OCC did not file a subsequent application for rehearing to challenge the commission's

determination. "[S]etting forth specific grounds for rehearing [in accordance with R.C. 4903.10] is a jurisdictional prerequisite for our review." *Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247, 638 N.E.2d 550 (1994). We therefore lack jurisdiction over OCC's arguments.

### 3. Challenges to the commission's approval of the stipulation under the three-part test

**{¶ 39}** OMAEG argues that the commission erred when it approved the joint stipulation to resolve the issues in the PPA Rider case. When considering whether to approve a stipulation, the commission employs the following three-part test, which this court has endorsed:

> 1. Is the settlement a product of serious bargaining among capable, knowledgeable parties?
>
> 2. Does the settlement, as a package, benefit ratepayers and the public interest?
>
> 3. Does the settlement package violate any important regulatory principle or practice?

*Consumers' Counsel v. Pub. Util. Comm.*, 64 Ohio St.3d 123, 126, 592 N.E.2d 1370 (1992).

#### a. OMAEG Proposition of Law No. 1: *Whether the stipulation benefits ratepayers and the public interest*

**{¶ 40}** In proposition of law No. 1, OMAEG argues that the commission erred in finding that the stipulation as a package benefits ratepayers and is in the public interest. OMAEG specifically claims that the commission's finding "was manifestly against the weight of the evidence and clearly unsupported by the record." OMAEG raises several arguments. None has merit.

(1) *OMAEG Proposition of Law No. 1, Section (A)*: Whether the commission
erred when it found that the PPA Rider will generate a $214 million credit

{¶ 41} OMAEG maintains that no party, including Ohio Power, estimated that the PPA Rider would generate a $214 million credit through the term of the PPA Rider. In the PPA Order, the commission cited the projected $214 million credit as one of many items under the stipulation that would benefit ratepayers and the public interest.

{¶ 42} OMAEG's challenge to the $214 million credit is misplaced. The $214 million credit was based on the proposed version of the PPA Rider that included the power-purchase agreements between Ohio Power and its affiliate-owned power plants as well as the power-purchase agreement between Ohio Power and OVEC. On rehearing, however, the stipulation was modified to remove Ohio Power's affiliate power plants from the PPA Rider, leaving only the OVEC-generated power in the rider. The removal of the affiliate power-purchase agreements reduced the projected credit to $110 million over the life of the PPA Rider. OMAEG therefore cannot demonstrate error because the $214 million credit no longer factors into the commission's decision.

(2) *OMAEG Proposition of Law No. 1, Sections (A)(2) through (4) and (B)(1)*:
Whether the commission made erroneous findings regarding financial need,
reliability, supply diversity, and economic development

{¶ 43} OMAEG contends that the commission erred when it found that a financial need existed to continue the generation plants Ohio Power had included in the PPA Rider. OMAEG further asserts that the record does not support the commission's finding that the PPA plants are at risk of premature retirement. Finally, OMAEG argues that no evidence supports the commission's finding that the PPA generation units are necessary to maintain reliability, supply diversity, and economic development.

**{¶ 44}** Although the commission considered the evidence submitted by Ohio Power related to the factors cited above, the commission made no factual findings in regard to those factors. In fact, in the commission's decision on rehearing, it expressly denied having made in the PPA Order "any specific findings regarding the PPA units' financial need, reliability, or environmental compliance, or regarding the economic impact of plant closures on electric prices." Accordingly, OMAEG has not shown any error on the commission's part.

(3) *OMAEG Proposition of Law No. 1, Sections (A)(5) and (B)(3)*: Whether the commission erred when it found that the PPA Rider provided rate stability

**{¶ 45}** OMAEG maintains that the record does not support the commission's finding that the PPA Rider will bring rate stability to customers and that the commission disregarded OMAEG's evidence that the PPA Rider will increase rate volatility. The commission relied on evidence that predicted the rider will provide added rate stability during periods in which extreme weather or economic conditions trigger increases in load. In these situations, "the rider can be expected to offset severe price spikes." Pub. Util. Comm. No. 14-1693-EL-RDR (Mar. 31, 2016), at 83. OMAEG points to other facts in the record that it believes should have led the commission to rule the other way. This is not sufficient to establish error on this point. First, the evidence relied on by the commission is sufficient to sustain its decision. Second, the mere fact that evidence before the commission points both ways does not justify reversal. *See Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, 871 N.E.2d 1176, ¶ 39; *see also Monongahela Power Co.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, at ¶ 29 ("appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record").

**{¶ 46}** OMAEG also claims that the commission's order is prejudicial to the manufacturing sector because "the PPA Rider may likely cost customers up to

$1.9 billion, or $1.5 billion on a net present value basis over the PPA Rider's term * * *." This claim is entirely speculative. Moreover, the commission did not disregard this evidence, as OMAEG asserts. Rather, it found that this evidence was fundamentally flawed. In short, the commission simply found Ohio Power's evidence more credible.

(4) *OMAEG Proposition of Law No. 1, Section (B)(2)*: Whether the commission erred when it found that the PPA Rider acted as a financial hedge

{¶ 47} OMAEG maintains that the record does not support the commission's finding that the PPA Rider will act as a financial hedge. OMAEG once again ignores that the commission cited evidence to support this finding. As OMAEG makes no other substantive challenge to the commission's finding on this point, we reject this argument.

*b.* OMAEG Proposition of Law No. 2, Section (A)*: Whether the stipulation violates any important regulatory principle or practice*

{¶ 48} In proposition of law No. 2(A), OMAEG claims that the commission erred when it found that the stipulation did not violate any important regulatory principle or practice. OMAEG alleges that the stipulation violates the state electric policies set forth in R.C. 4928.02(A), (B), and (H) of ensuring reasonably-priced retail electric service, ensuring the availability of unbundled and comparable retail electric service, and avoiding anticompetitive subsidies. This argument misses the mark for the following reasons.

{¶ 49} First, the relevant provisions of R.C. 4928.02 do not impose strict conditions on the commission. By its terms, R.C. 4928.02 does not require anything but merely explains "the policy of this state." We have held that "such policy statements are 'guideline[s] for the commission to weigh' in evaluating utility proposals to further state policy goals, and it has been 'left * * * to the commission to determine how best to carry [them] out.' " (Ellipsis and brackets added in *Columbus S. Power Co.*) *In re Application of Columbus S. Power Co.*,

128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 62, quoting *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 125 Ohio St.3d 57, 2010-Ohio-134, 926 N.E.2d 261, ¶ 39-40. The commission weighed these policy considerations in reviewing the stipulation. That alone is grounds to reject OMAEG's argument.

{¶ 50} Second, OMAEG's claim that the commission violated state electric policy when it approved the PPA Rider raises questions of fact, not law, and OMAEG's arguments lack factual evidence in support. For instance, OMAEG claims that the PPA Rider "violates R.C. 4928.02(B) because it encumbers and discourages shopping for retail electric service," but OMAEG points to no evidence in support of this claim. Without evidence in support, OMAEG is merely speculating about the potential effect of the commission's order on retail pricing and competition. We will not reverse a commission order based on speculation. *See In re Application of Ormet Primary Aluminum Corp.*, 129 Ohio St.3d 9, 2011-Ohio-2377, 949 N.E.2d 991, ¶ 22-24; *In re Complaint of Buckeye Energy Brokers, Inc. v. Palmer Energy Co.*, 139 Ohio St.3d 284, 2014-Ohio-1532, 11 N.E.3d 1126, ¶ 24.

**4. *OMAEG Proposition of Law No. 3, Section (A):* Whether the commission complied with R.C. 4903.09 when it approved the OVEC-only PPA Rider**

{¶ 51} OMAEG contends under proposition of law No. 3 that the commission violated R.C. 4903.09 when it approved the OVEC-only PPA Rider. R.C. 4903.09 requires that the commission's " 'order must show, in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by the [commission] in reaching its conclusion.' " *Indus. Energy Users-Ohio*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, at ¶ 30, quoting *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (1987). Although strict compliance with the terms of R.C. 4903.09 is not required, "summary rulings and conclusions" that do not develop "the supporting rationale or record have been reversed and remanded." *MCI*

*Telecommunications* at 312. We find that the commission complied with R.C. 4903.09.

*a. Whether the commission's decision to reduce Ohio Power's credit commitment was supported by evidence and reasoning*

**{¶ 52}** Under the stipulation, Ohio Power agreed to provide customers with a $100 million credit commitment—or guarantee—if the PPA Rider resulted in a charge to customers or a credit that is less than certain agreed-to amounts in any of the last four years of the PPA Rider (2020 through 2024). The $100 million amount was calculated based on the combined OVEC power-purchase agreement and affiliate power-purchase agreements. On rehearing, the commission granted Ohio Power's request to reduce the $100 million credit commitment to $15 million because the affiliate power-purchase agreements were withdrawn from the PPA Rider and the OVEC PPA generating units made up roughly 15 percent of the capacity of the combined OVEC and affiliate power-purchase agreements.

**{¶ 53}** OMAEG claims that the commission failed to comply with R.C. 4903.09 when it allowed Ohio Power to scale back its credit commitment on rehearing. This is incorrect. The commission reasoned that the reduction was justified based on the fact that OVEC's 440 megawatts of capacity is less than 15 percent of the combined capacity under the OVEC power-purchase agreement and affiliate power-purchase agreements. Moreover, the commission cited evidence verifying the ratio of OVEC capacity to the combined OVEC and affiliate capacity. We therefore reject this argument.

*b. Whether the commission cited evidence when it found that the PPA Rider will generate a $110 million credit*

**{¶ 54}** OMAEG maintains that the commission's finding that the OVEC-only PPA Rider would provide ratepayers with a $110 million net credit over the life of the rider was entirely unsupported and manifestly against the weight of the evidence. Contrary to OMAEG's claim, the commission did cite evidence to

support this finding, namely a party's exhibit. This exhibit projected the net credit based on a forecast that included only OVEC power plants.

{¶ 55} OMAEG counters that this exhibit was not presented during the stipulation phase of the proceeding, was not supported by Ohio Power, and was not considered in the PPA Order. Nevertheless, the exhibit was admitted into the record, and none of OMAEG's assertions precludes reliance on it. *See In re Application of Ohio Power Co.*, 140 Ohio St.3d 509, 2014-Ohio-4271, 20 N.E.3d 699, at ¶ 35.

{¶ 56} OMAEG also argues that the $110 million forecast conflicts with Ohio Power's own projections. OMAEG refers here to evidence submitted by Ohio Power that the capacity generated by the units in the OVEC power-purchase agreement made up roughly 15 percent of the capacity generated by all units in the OVEC and affiliated power-purchase agreements combined. OMAEG notes that Ohio Power used this roughly 15 percent share of capacity to scale back its prior credit commitment from $100 million to $15 million. According to OMAEG, the 15 percent capacity share means that the OVEC-only PPA would provide a $30.2 million net credit benefit—that is, 15 percent of the projected credit benefit of $214 million based on the PPA Rider contained in the combined OVEC and affiliate power-purchase agreements discussed above.

{¶ 57} OMAEG's argument incorrectly calculates the net credit benefit solely on the capacity output of the generating units. OMAEG overlooks that the projected benefit was based on several data factors, including the expected costs of the PPA generating units (such as hourly energy prices), long-term forecasts of PJM wholesale-power prices, the company's capital structure, and the company's return on equity. OMAEG has not demonstrated that the commission's findings are against the manifest weight of the evidence or clearly unsupported by the record. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. We therefore reject OMAEG's argument.

*c. Whether the commission's finding that the OVEC-only PPA Rider had value as a financial hedge complied with R.C. 4903.09*

{¶ 58} OMAEG contends that the commission failed to explain how the OVEC-only PPA Rider still had sufficient value as a financial hedge, as compared to the value provided under the PPA Rider contained in the combined OVEC and affiliate power-purchase agreements. OMAEG ignores that the commission addressed this point on rehearing.

{¶ 59} As discussed, the PPA Rider was designed to act as a financial hedge against market volatility, particularly during extreme weather conditions. In brief, the rider is intended to provide added rate stability during periods of extreme weather, when the rider is expected to offset severe price spikes in retail electric service. The commission found that the OVEC-only PPA Rider retained value as a financial hedge because it was projected to provide ratepayers with a net credit of $110 million over the life of the rider. We therefore reject this argument.

*d. Whether the commission cited evidence that the OVEC-only PPA Rider approved in this case was different from the one rejected in the ESP case*

{¶ 60} OMAEG makes a blanket assertion that the commission failed to cite any evidence that the OVEC-only PPA Rider approved in this case was different from the OVEC-only PPA Rider that was not approved in the ESP case. This assertion is incorrect.

{¶ 61} The commission declined to approve the OVEC-only PPA Rider in the ESP case because the record reflected that (1) the rider would likely result in a net cost to ratepayers during the three-year ESP and (2) Ohio Power had refused to commit to the rider over the long term, when customers were most likely to see a credit. In addition, Ohio Power's evidence in the ESP case consisted of several wildly varying projections of the impact of the OVEC-only PPA Rider—ranging from a $52 million net *cost* to an $8.4 million net *credit*. In the ESP case, the commission reviewed "differing data inputs and assumptions" and projections that

attempted to predict OVEC's costs and revenues, as well as PJM prices for energy and capacity, over the three-year ESP period. The commission also noted that there was considerable uncertainty during the ESP proceedings with respect to pending PJM market reforms, environmental regulations, and federal litigation. In light of this uncertainty and speculation, the commission found that it would not be prudent to allow Ohio Power to recover costs under the PPA Rider at that time because the commission was unable to determine the rate impact of the PPA Rider based on the record before it.

**{¶ 62}** In contrast, the commission approved cost recovery under the OVEC-only PPA Rider in this case based on evidence that the rider was projected to provide ratepayers with a net credit of $110 million over the life of the rider and approximately $11 million during the ESP. Moreover, unlike in the ESP case, Ohio Power committed to retain the PPA Rider through May 31, 2024. Finally, in this case Ohio Power is required to fund ratepayer credits of up to $15 million over four years to offset any unexpected charges or credits less than the amount of the credit commitment under the OVEC-only PPA Rider, which was not a benefit available in the ESP case. We therefore reject OMAEG's argument on this point.

**5.** *OMAEG Proposition of Law No. 3, Section (B):* **Whether the commission violated R.C. 4903.10 when it authorized the OVEC-only PPA Rider on rehearing**

**{¶ 63}** As a final matter under its third proposition of law, OMAEG claims that the commission violated R.C. 4903.10(B) when it granted Ohio Power's request to return to the OVEC-only PPA Rider on rehearing. Specifically, OMAEG claims that the commission violated the following provision of R.C. 4903.10(B):

> If the commission grants such rehearing, it shall specify in the notice of such granting the purpose for which it is granted. The commission shall also specify the scope of the additional evidence,

22

if any, that will be taken, but it shall not upon such rehearing take any evidence that, with reasonable diligence, could have been offered upon the original hearing.

**{¶ 64}** OMAEG asserts that this language precluded Ohio Power from amending the PPA Rider on rehearing because the company could have sought an OVEC-only PPA Rider at the original hearing. It is not clear to us, however, how this provision was violated. Although R.C. 4903.10(B) bars submission of *evidence*—not new or amended proposals—on rehearing that "with reasonable diligence, could have been offered upon the original hearing," OMAEG acknowledges that Ohio Power did not offer *any* new evidence on rehearing. Rather, Ohio Power amended its proposal based on evidence that had already been offered. The argument therefore lacks merit.

**6.** *OCC Proposition of Law No. 3:* **Whether the commission erred in its consideration of the competition-incentive rider**

**{¶ 65}** OCC argues under proposition of law No. 3 that the commission erred in two ways when it approved the competition-incentive rider ("CIR") in the proceedings below. We disagree.

**{¶ 66}** First, OCC argues that the commission erred when it found that OCC's challenges to the CIR were premature. We lack jurisdiction to consider this claim, however, because OCC did not set forth this claimed error in its notice of appeal. R.C. 4903.13 (establishing that the procedure for seeking reversal of a commission order is through a notice of appeal "setting forth the order appealed from and the errors complained of"); *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 21.

**{¶ 67}** Second, OCC argues that the CIR violates the state policy announced in R.C. 4928.02(A) of ensuring, among other things, nondiscriminatory and reasonably priced retail electric service. OCC cannot show error here, however,

because the commission never addressed whether the CIR violated R.C. 4928.02(A). As mentioned, the commission declined to decide whether the CIR was lawful, because the rider had not yet been implemented and OCC's challenge was not ripe for review.

## IV. CONCLUSION

{¶ 68} For the foregoing reasons, we affirm the commission's order.

Order affirmed.

FRENCH, FISCHER, DEWINE, and DEGENARO, JJ., concur.

O'DONNELL and KENNEDY, JJ., concur in judgment only.

————————————

Bruce J. Weston, Maureen R. Willis, and William Michael, for appellant Office of the Ohio Consumers' Counsel.

Carpenter Lipps & Leland, L.L.P., and Kimberly W. Bojko, for appellant Ohio Manufacturers' Association Energy Group.

Michael DeWine, Attorney General, and Steven L. Beeler, William L. Wright, and Werner L. Margard III, Assistant Attorneys General, for appellee.

Steven T. Nourse, Matthew S. McKenzie, and Christen M. Blend; and Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, and L. Bradfield Hughes, for intervening appellee.

————————————