**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Complaint of Direct Energy Business, L.L.C. v. Duke Energy Ohio, Inc.*, Slip Opinion No. 2020-Ohio-4429.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-4429

IN RE COMPLAINT OF DIRECT ENERGY BUSINESS, L.L.C., INTERVENING APPELLEE, *v.* DUKE ENERGY OHIO, INC., APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Complaint of Direct Energy Business, L.L.C. v. Duke Energy Ohio, Inc.*, Slip Opinion No. 2020-Ohio-4429.]**

*Public utilities—Jurisdiction—General Assembly has confined Public Utilities Commission's jurisdiction to the supervision of public utilities—Public Utilities Commission lacked jurisdiction under Ohio law to decide complaint against company because company did not act as a public utility when it merely provided meter-data-management service—Order reversed.*

(No. 2019-1058—Submitted June 2, 2020—Decided September 17, 2020.)

APPEAL from the Public Utilities Commission, No. 14-1277-EL-CSS.

_____

O'CONNOR, C.J.

{¶ 1} In this appeal from a decision of the Public Utilities Commission of Ohio (the "PUCO"), we determine whether the PUCO had jurisdiction over a

complaint filed against appellant, Duke Energy Ohio, Inc. ("Duke Energy"), regarding Duke Energy's role as a meter-data-management agent. Intervening appellee, Direct Energy Business, L.L.C. ("Direct"), purchases electric-generation services from the operator of a wholesale-power market and resells them to end-use customers through Duke Energy's distribution system. In this case, Duke Energy acted as a meter-data-management agent for Direct, providing electric-usage data about Direct's customers to the wholesale-market operator. The market operator then used the data to invoice Direct for its purchases.

{¶ 2} In 2013, Duke Energy failed to calculate usage data for a monetarily-large customer of Direct, which resulted in Direct being overbilled. Seeking redress, Direct filed a complaint against Duke Energy with appellee, the PUCO. The PUCO ruled in favor of Direct, determining that Direct had established by a preponderance of the evidence that Duke Energy's failure to provide accurate readings of the customer's generation usage constituted "inadequate service." Duke Energy has appealed to this court. Because we conclude that Duke Energy was not acting as a public utility when serving as Direct's meter-data-management agent, we reverse the PUCO's order and remand to the PUCO with instructions for it to dismiss Direct's complaint for lack of jurisdiction.

## I. RELEVANT BACKGROUND

{¶ 3} The facts in this case are not disputed by the parties.

{¶ 4} Under Ohio law, a consumer served by an electric-distribution utility such as Duke Energy may choose to receive generation service through Duke Energy's standard service offer, *see* R.C. 4928.141, or through a contract with a PUCO-certified provider such as Direct, *see* R.C. 4928.08. *See also* Ohio Adm.Code 4901:1-21-01 et seq. Duke Energy must deal with providers such as Direct in accordance with its PUCO-approved Certified Supplier Tariff. In this case, Section 14.1 of that tariff provides that Duke Energy, as the meter-data-management agent for Direct, "will supply hourly load data" to the market operator

on Direct's behalf "in accordance" with a federal tariff, namely, the Open Access Transmission Tariff.

{¶ 5} The market operator referred to above is PJM Interconnection, L.L.C. ("PJM"), "a multiutility regional transmission organization designated by the Federal Energy Regulatory Commission ['FERC'] to coordinate the movement of wholesale electricity in all or part of 13 states—including Ohio—and the District of Columbia." *In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, ¶ 4, fn. 1. In PJM's parlance, an entity such as Direct is a load-serving entity, meaning that it serves retail consumers within PJM's footprint under the authority of state law. PJM, *PJM Glossary*, www.pjm.com/Glossary.aspx#index_L (accessed Sept. 10, 2020) [https://perma.cc/X766-L972]. "Load is the overall usage or consumption of electricity on a power supply." *Id.* When load-serving entities such as Direct acquire energy from the PJM-wholesale market for resale to retail consumers, they pay PJM for that energy. *See PPL Energyplus, L.L.C. v. Nazarian*, 974 F.Supp.2d 790, 804 (D.Md.2013).

{¶ 6} Duke Energy submits daily estimates of load data associated with each load-serving entity in its territory; relying on those estimates, PJM then generates weekly invoices for each load-serving entity in Duke Energy's territory. Duke Energy thereafter submits actual meter data to PJM that can be used to adjust the initial invoices. When Direct set up its account with PJM, it granted Duke Energy the right to be its meter-data-management agent and declined the right to review the load data before Duke Energy submitted that data to PJM.

{¶ 7} The dispute in this case arose when Duke Energy failed to calculate usage data for a large customer of Direct—SunCoke Energy ("SunCoke"). SunCoke operates a facility in Middletown, Ohio. In January 2013, SunCoke switched to Direct for its electric-generation service. As a result, it began receiving two bills—one from Direct for generation service and another from Duke Energy

for distribution service. After the switch, Duke Energy ceased providing the manual calculation of SunCoke's net-energy consumption.

{¶ 8} In May 2013, Direct began reconciling its forecasted load and actual load within Duke Energy's territory for January 2013. During the reconciliation process, Direct noticed that the charges imposed by PJM were significantly higher than they had been in previous months. Direct traced the problem to the day in January 2013 on which SunCoke had become its customer.

{¶ 9} After reviewing the January 2013 invoice that SunCoke had received from Duke Energy for its distribution service, Direct determined that the usage figure on the invoice did not match the usage figure that Duke Energy had reported to PJM. Direct deduced that the usage figure on the invoice sent by Duke Energy to SunCoke was correct because it was consistent with SunCoke's historical usage. Direct and Duke Energy eventually rectified their billing dispute for the months of March to July 2013; however, they were unable to do so for the months of January to February.

{¶ 10} In July 2014, Direct filed a complaint against Duke Energy with the PUCO alleging that Duke Energy's actions or inactions had caused Direct to overpay PJM by $2 million for the months of January to February 2013. Direct requested the PUCO to order Duke Energy to either initiate resettlement with PJM or to pay $2 million dollars in restitution to Direct. The PUCO declined to award such relief, determining instead that Duke Energy had failed to furnish "adequate service" as required by R.C. 4905.22 and was barred from enforcing a hold-harmless clause in its PUCO-filed tariff. Duke Energy later sought rehearing by the PUCO, which the PUCO denied. Duke Energy then filed this appeal.

## II. ANALYSIS

{¶ 11} Duke Energy argues that the duty of "adequate service" does not apply to it here because it was not acting as a public utility when it rendered meter-data-management services to Direct. We agree.

4

{¶ 12} Under Ohio law, "[e]very public utility shall furnish necessary and adequate service and facilities." R.C. 4905.22. To that end, "any person" may file a written complaint with the PUCO against "any public utility" alleging that "any service" furnished by the utility "is, or will be inadequate." R.C. 4905.26.

{¶ 13} As these statutes make clear, only a public utility is required to furnish adequate service and only a public utility may be held in violation of the statutes for failing to furnish such service. Thus, any inquiry into the adequacy of a particular service under the statutes depends on the existence of a "public utility." And if Duke Energy did not act as a public utility under the facts of this case, then the PUCO has no jurisdiction to hold Duke Energy liable for failing to furnish adequate service.

{¶ 14} For the purpose of R.C. Chapter 4905, an entity like Duke Energy is deemed a "public utility" when it is "engaged in the business of supplying electricity for light, heat, or power purposes to consumers within this state, including supplying electric transmission service for electricity delivered to consumers in this state." R.C. 4905.03(C) (defining an "electric light company"); *see also* R.C. 4905.02; *S.G. Foods, Inc. v. FirstEnergy Corp.*, Pub. Util. Comm. Nos. 04-28-EL-CSS et al., 2006 WL 769488 (Mar. 7, 2006) (a company is a public utility only when it is supplying electricity or transmission services to consumers within the state of Ohio).[1] We have observed that "the term 'consumer,' used in reference to an Ohio public utility supplying electric energy, includes an Ohio resident receiving and paying for the electric energy furnished him by such public utility." *Shopping Ctrs. Assn. v. Pub. Util. Comm.*, 3 Ohio St.2d 1, 208 N.E.2d 923 (1965), paragraph two of the syllabus (interpreting a prior version of R.C. 4905.03).

{¶ 15} Applying this language, we conclude that Duke Energy does not fit the definition of an "electric light company" in R.C. 4905.03(C) in this case because

---

1. We do not address the language in R.C. 4905.03(C) referring to "electric-transmission service" because no party's brief claims that it is relevant to our analysis here.

the parties have provided no evidence to support a claim that Duke Energy was "engaged in the business of supplying electricity for light, heat, or power purposes" to Direct.

{¶ 16} At oral argument, the PUCO and Direct unconvincingly attempted to explain how Duke Energy's actions could be construed as satisfying the language of R.C. 4905.03(C). The PUCO stated that Duke Energy's distribution facilities facilitated the delivery of electricity to SunCoke. Direct echoed this point, arguing that Duke Energy had supplied electricity to SunCoke by way of its distribution system. But those arguments miss the point. Our concern here is the relationship between Duke Energy and Direct, not Duke Energy and SunCoke. The PUCO also argued that metering is an integral part of supplying electricity. But the definition of "electric light company" in R.C. 4905.03(C) makes no mention of metering.

{¶ 17} We likewise see no evidence that Direct was a "consumer" of electricity supplied by Duke Energy, as the record does not establish that Direct paid for and received electric energy furnished by Duke Energy. R.C. 4905.03(C); *Shopping Ctrs. Assn.*, 3 Ohio St.2d 1, 208 N.E.2d 923, at paragraph two of the syllabus. Tellingly, Direct does not argue otherwise.

{¶ 18} The PUCO stresses Direct's purported status as a "captive customer" of Duke Energy, arguing that Direct had no choice but to accept Duke Energy as its meter-data-management agent. We find the term "captive customer" to be a poor fit under the facts of this case.

{¶ 19} First and most fundamentally, that term lacks any basis in the statutory definition of a public utility. R.C. 4905.03(C) speaks in terms of "consumers" of electricity. It follows that the PUCO cannot circumvent the statutory definition by creating a status label that the General Assembly itself did not prescribe. *See Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 51 ("The PUCO, as a creature of statute, has no authority to act beyond its statutory powers").

{¶ 20} Second, contrary to what the term "captive customer" suggests, Direct was not powerless to protect itself against the circumstances that arose here. As Duke Energy points out, Direct waived the right to check the load data before Duke Energy submitted the data to PJM.

{¶ 21} Last, nothing in the record establishes that Direct bought or purchased meter-data-management services from Duke Energy—indeed, Direct concedes that Duke Energy does not even list such services as a line item on its invoices. We find that this undermines Direct's purported status as a "captive customer" because, in the commercial sense, a "customer" is generally one who buys or purchases goods or services. *See Black's Law Dictionary* 468 (10th Ed.2014); *Merriam-Webster's Collegiate Dictionary* 308 (11th Ed.2007).

{¶ 22} We are also unpersuaded by Direct's and the PUCO's citations to our decision in *Kazmaier Supermarket, Inc. v. Toledo Edison Co.*, in which we observed that "[e]very public utility in Ohio is required to file, for commission review and approval, tariff schedules that detail rates, charges and classifications for every service offered." 61 Ohio St.3d 147, 150, 573 N.E.2d 655 (1991). But *Kazmaier* has little applicability here because, unlike Direct, the complainant in that case was a consumer who had paid the company for electricity service. *Id.* at 147-150. Thus, the company's status as a public utility in *Kazmaier* was never in doubt.

{¶ 23} For similar reasons, we reject Direct's reliance on R.C. 4905.04 (vesting the PUCO with powers to oversee public utilities), R.C. 4905.30(A) (requiring public utilities to file printed schedules of their services), and 4905.32 (forbidding public utilities from departing from the terms of their printed schedules) because those statutes all tie the PUCO's regulatory authority to the existence of a "public utility." As we have determined above, Duke Energy did not act as a public utility under the facts of this case.

**{¶ 24}** Finally, we reject Direct's reliance on our decision in *In re Application of Duke Energy Ohio, Inc., for Approval of its Fourth Amended Corporate Separation Plan*, 148 Ohio St.3d 510, 2016-Ohio-7535, 71 N.E.3d 997, in which we addressed Duke Energy's corporate-separation plan under R.C. 4928.17. Contrary to what Direct seems to suggest, we did not announce in that case a principle that would bring Duke Energy's meter-data-management services within the scope of the PUCO's regulatory authority as it relates to R.C. Chapter 4905. Indeed, that decision never addressed, let alone cited, a single statute within R.C. Chapter 4905.

**{¶ 25}** The foregoing analysis compels the conclusion that the PUCO lacked jurisdiction under Ohio law for it to decide Direct's complaint because the General Assembly has confined the PUCO's "jurisdiction" to the supervision of "public utilities." R.C. 4905.04; R.C. 4905.05. Duke Energy did not act as a public utility under the facts of this case.

### III. CONCLUSION

**{¶ 26}** We reverse the PUCO's order and remand to the PUCO with instructions for it to dismiss Direct's complaint for lack of jurisdiction. Because we conclude that the PUCO lacked jurisdiction under Ohio law to decide Direct's complaint, we decline to address Duke Energy's remaining state and federal claims.

Order reversed

and cause remanded.

KENNEDY, FRENCH, FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

———————————

Whitt Sturtevant, L.L.P., and Mark A. Whitt and Lucas A. Fykes, for intervening appellee.

Rocco O. D'Ascenzo, Jeanne W. Kingery, and Larisa M. Vaysman, for appellant.

Taft Stettinius & Hollister, L.L.P., and Aaron M. Herzig and Elizabeth M. Brama, for appellant.

Dave Yost, Attorney General, and John H. Jones and Jodi J. Bair, Assistant Attorneys General, for appellee.

_____