[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Rev. of the Power-Purchase-Agreement Rider of Ohio Power Co. for 2018 and 2019*, Slip Opinion No. 2026-Ohio-1485.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1485

IN RE REVIEW OF THE POWER-PURCHASE-AGREEMENT RIDER OF OHIO POWER COMPANY FOR 2018 AND 2019; OFFICE OF THE OHIO CONSUMERS' COUNSEL ET AL., APPELLANTS; PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE; OHIO POWER COMPANY, INTERVENING APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Rev. of the Power-Purchase-Agreement Rider of Ohio Power Co. for 2018 and 2019*, Slip Opinion No. 2026-Ohio-1485.]**

*Public utilities—Public Utilities Commission did not commit reversible error in deciding to credit evidence showing that a must-run strategy for operating two coal plants was prudent when the decision to utilize that strategy was made—Commission did not violate procedural due process or Adm.Code 4901-1-28(E) in denying party's motion for subpoena to compel commission staff member to appear and testify at commission's hearing, because testimony presented by other witnesses covered the topic of concern and the party had an opportunity to cross-examine those witnesses—Commission did not err in failing to apply an appearance-of-*

*impropriety standard when considering whether auditor was prevented from conducting an independent audit—Orders affirmed.*

(No. 2024-1735—Submitted December 10, 2025—Decided April 29, 2026.)

APPEAL from the Public Utilities Commission, Nos. 18-1004-EL-RDR and 18-1759-EL-RDR.

_____

FISCHER, J., authored the opinion of the court, which KENNEDY, C.J., and DEWINE, BRUNNER, HENSAL, HAWKINS, and SHANAHAN, JJ., joined. JENNIFER HENSAL, J., of the Ninth District Court of Appeals, sat for DETERS, J.

**FISCHER, J.**

{¶ 1} Appellants, the Office of the Ohio Consumers' Counsel ("OCC") and the Ohio Manufacturers' Association Energy Group ("OMAEG"), appeal from appellee Public Utilities Commission of Ohio's decision to adopt the recommendations provided by an independent auditor regarding the implementation of a power-purchase-agreement rider ("the PPA Rider" or "the rider") by intervening appellee Ohio Power Company ("AEP Ohio") for 2018 and 2019. Specifically, appellants challenge the commission's conclusion that all costs and sales flowing through the rider were prudent and in the best interest of AEP Ohio's retail customers.

{¶ 2} Appellants advance three propositions of law on appeal: (1) the commission's decision is against the manifest weight of the evidence, (2) the commission violated due process and a commission rule by not issuing a subpoena for the hearing testimony of a commission staff member, and (3) the commission adopted the wrong standard for determining whether that staff member improperly interfered with the audit. Although not denominated as a proposition of law, appellants also seek a refund of charges paid by AEP Ohio's customers under the

PPA Rider, and they ask us to overrule our precedent to the extent that it forbids refunds.

{¶ 3} Because we find no merit in appellants' three propositions of law, we affirm the commission's decision, obviating any need for us to address appellants' refund-related arguments.

## I. BACKGROUND

{¶ 4} Once again, we are asked to review AEP Ohio's PPA Rider, which is tied to AEP Ohio's relationship with the Ohio Valley Electric Corporation ("OVEC"). We have explained that

> [t]he PPA Rider works as either a charge or a credit to [AEP Ohio's] retail customers, depending on how OVEC's costs compare to the market rate. PJM Interconnection ("PJM") operates a competitive wholesale-electricity market where rates are set.[1] If the revenue generated from sales to the PJM market is lower than the costs of the power, [AEP Ohio's] customers would pay a surcharge to [AEP Ohio] through the PPA Rider to make up the difference. But if the PJM market rates are higher than the power costs, customers would receive a credit through the PPA Rider.

(Footnote in original.) *In re Application of Ohio Power Co.*, 2018-Ohio-4698, ¶ 4.

{¶ 5} OVEC's output comes from two coal plants that began operating in the mid-1950s—the Kyger Creek plant, consisting of five generating units, is located in Cheshire, Ohio, and the Clifty Creek plant, consisting of six generating units, is located in Madison, Indiana. AEP Ohio is considered a sponsoring

---

1. PJM Interconnection is a multiutility regional transmission organization designated by the Federal Energy Regulatory Commission to coordinate the movement of wholesale electricity in all or part of 13 states—including Ohio—and the District of Columbia.

company of OVEC and by contract is entitled to 19.93 percent of OVEC's output. OVEC has an operating committee that establishes a framework for OVEC's management to conduct OVEC's daily operations. Operational decisions require a two-thirds vote by committee members. AEP Ohio has one committee vote on behalf of itself and its affiliates.

### A. The commission authorizes the PPA Rider on a placeholder basis

{¶ 6} In 2015, the commission authorized AEP Ohio to establish the PPA Rider on a placeholder basis with a rate of zero. *See In re Application of Ohio Power Co.*, 2018-Ohio-4697, ¶ 3-4. We dismissed OCC and OMAEG's appeal of the commission's decision in that case, observing that it was unclear how harm could arise from a rider that did not recover money from customers. *Id.* at ¶ 1, 10-18.

### B. The commission authorizes cost recovery under the PPA Rider, subject to a prudency review

{¶ 7} In 2016, the commission authorized AEP Ohio to begin collecting money from its customers through the PPA Rider. *See In re Application Seeking Approval of Ohio Power Co.'s Proposal to Enter into an Affiliate Power Purchase Agreement for Inclusion in the Power Purchase Agreement Rider*, PUCO Nos. 14-1693-EL-RDR and 14-1694-EL-AAM, 2016 WL 3482857, *91 (May 31, 2016). In doing so, the commission emphasized that the rider would be subject to an annual audit, and it explained that recovery of retail costs under the rider may be disallowed "if the output from the units was not bid in a manner that is consistent with participation in a broader competitive marketplace comprised of sellers attempting to maximize revenues." *Id.* at *75. The commission noted that AEP Ohio would bear the burden of proving that its "bidding behavior [was] prudent and in the best interest of retail ratepayers." *Id.* We affirmed the commission's decision on appeal. *See Ohio Power Co.*, 2018-Ohio-4698, at ¶ 1-2, 68.

*C. The commission conducts a prudency review of the PPA Rider*

{¶ 8} The present case began when the commission entered an order directing its staff to issue a request for proposal ("RFP") for the purpose of obtaining audit services to assist in an audit of the PPA Rider. *See* 2020 WL 12813029, *1 (Jan. 15, 2020). The audit's purpose was to "establish the prudency of all costs and sales flowing through the PPA Rider and to demonstrate that [AEP Ohio's] actions were in the best interest of retail ratepayers . . . for the period spanning January 1, 2018, through December 31, 2019." *Id.* at *6. The commission selected London Economics International, L.L.C. ("LEI" or "the auditor"), to conduct the audit. OCC and OMAEG later intervened in the commission proceedings. *See* 2021 WL 228925, *3 (Jan. 19, 2021) (granting OCC's motion to intervene); 2021 WL 4169349, *4 (Sept. 10, 2021) (granting OMAEG's motion to intervene).

{¶ 9} On September 16, 2020, LEI issued an audit report. LEI found that the "processes, procedures, and oversight [employed by AEP Ohio] were mostly adequate and consistent with good utility practice." LEI did not make any findings of imprudence, but it did find "that the OVEC plants cost customers more than the cost of energy and capacity that could be bought on the PJM wholesale market." LEI recognized, however, that other considerations, such as the plants' contributions to employment and fuel diversity in the State, could outweigh the energy cost paid by AEP Ohio's customers.

{¶ 10} LEI also found the following:

- The true-up process between forecasted PPA Rider charges and actual PPA Rider charges were accurate but the lag in that process should be reduced from two billing cycles (six months) to one billing cycle (three months);

- OVEC should reconsider its must-run offer strategy since markets can change and at times a must-run strategy may not be optimal;

- The plants performed well with some "small exceptions";

- OVEC's operating-committee meetings should be held more frequently to discuss energy-offer strategies, which could help prevent the plants from running when energy prices are too low to cover variable costs.

{¶ 11} While this case was pending before the commission, OCC filed a public-records request with the commission, through which OCC received a copy of an email exchange between commission staff member Mahila Christopher and Dr. Marie Fagan, LEI's chief economist. In the email exchange, Dr. Fagan confirms that LEI shared a draft of its audit report with commission staff. After reviewing the draft, Christopher responded to Dr. Fagan with what she described as "Staff's editorial suggestions" regarding the "overall tone of the draft report." Christopher informed Dr. Fagan that a "[m]ilder tone and intensity of language would be recommended" for the following sentence in the report: "Therefore, keeping the plants running does not seem to be in the best interests of the ratepayers." In a later version of the draft report that LEI shared with AEP Ohio, that sentence was replaced with the following: "However, LEI's analysis shows that the OVEC contract overall is not in the best interest of AEP Ohio ratepayers." But neither sentence is in the final audit report.

{¶ 12} To understand why these sentences were removed from the final audit report, OCC filed with the commission a motion for a subpoena to compel Christopher to appear and testify at the commission's hearing. An attorney examiner held the motion in abeyance, pending the questioning of Rodney Windle, who was Christopher's supervisor, and Dr. Fagan at the commission's hearing.

{¶ 13} At the commission's hearing, Dr. Fagan testified that commission staff had asked LEI to make revisions to its audit report and that LEI had agreed to do so. She added that LEI does not make revisions that it does not agree with and that the revisions that LEI agreed to make in this case did not change its material findings from the audit. Near the conclusion of the commission's hearing, the attorney examiner denied OCC's motion for a subpoena.

{¶ 14} In its opinion and order, the commission affirmed the denial of OCC's motion for a subpoena, observing that the parties had been granted "considerable leeway" to question Dr. Fagan about the language in the draft audit reports. 2024 WL 4039778, *12 (Aug. 21, 2024). It further found no evidence that undue influence had prevented LEI from conducting an independent audit of the PPA Rider. *Id.* at *22. Regarding the merits of the prudency review, the commission determined that all costs and sales flowing through the rider were prudent; it affirmed the findings as stated in LEI's audit report and adopted LEI's recommendations as its own. *Id.*

{¶ 15} According to the commission, the "dominant" issue to be determined was whether it was prudent for the OVEC plants to operate under a must-run strategy. *Id.* at *23. Under a must-run strategy, an operator determines when to schedule a generating unit to run, regardless of wholesale-energy prices. Thus, even if the market price of energy falls below a unit's operating costs, the unit will remain on, thus incurring losses. In contrast to a must-run strategy, a plant may commit its output under an economic strategy, whereby the plant's units will run only if it is the least costly option available to the market. The commission determined that OVEC's decision to employ a must-run strategy in 2018 and 2019 was prudent when viewed as of the time OVEC made its decision. *Id*. However, in hindsight, the commission recognized that an economic strategy may have been prudent for OVEC to adopt in some months; therefore, the commission adopted LEI's recommendation that AEP Ohio and OVEC revisit the soundness of the must-run strategy. *Id.*

{¶ 16} The commission denied appellants' first and second rehearing applications and, in doing so, clarified that the actions taken by AEP Ohio were in the best interests of its customers. 2024 WL 4581311, *1, 4, 25 (Oct. 15, 2024); 2024 WL 5009879, *1, 3-4 (Dec. 4, 2024).

{¶ 17} This appeal followed. Appellants challenge the commission's decision as set forth in its opinion and order, as well as the commission's entry on rehearing and second entry on rehearing. We granted AEP Ohio's motion to intervene as an appellee. 2025-Ohio-86.

## II. ANALYSIS

{¶ 18} "R.C. 4903.13 provides that a [commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 2004-Ohio-6767, ¶ 50. We have "complete and independent power of review as to all questions of law." *Canton Storage & Transfer Co. v. Pub. Util. Comm.*, 1995-Ohio-282, ¶ 16. But we do not "reweigh the evidence or second-guess the [commission] on questions of fact." *In re Complaints of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 35.

*A. Whether the commission's orders are against the manifest weight of the evidence*

{¶ 19} In their first proposition of law, appellants contend that the commission's determination regarding the prudency of the costs and sales flowing through the PPA Rider for 2018 and 2019 was against the manifest weight of the evidence. In their view, the commission overlooked evidence of imprudence and failed to account for language in the draft audit reports that cast doubt on the wisdom of OVEC's strategy for running the plants. Before analyzing this argument, we clarify two concepts: the standard of review applicable to our review of commission decisions and what constitutes a prudent decision.

{¶ 20} Under the standard applicable to our review of commission decisions, we will not disturb the commission's factual determinations when the record contains sufficient probative evidence showing that the commission's decision was not manifestly against the weight of the evidence and was not so

clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 2004-Ohio-6896, ¶ 29; *see also* R.C. 4903.13 (this court shall modify a commission order only if, on consideration of the record, the order is found to be unlawful or unreasonable). To this end, we will not second-guess the commission on questions of fact unless the appellants have shown that the commission's findings are manifestly against the weight of the evidence. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 2007-Ohio-4276, ¶ 29. In conducting a manifest-weight-of-the-evidence review, we determine whether, in view of the conflicting evidence, the fact-finder (here, the commission) clearly lost its way, resulting in a miscarriage of justice. *See In re Z.C.*, 2023-Ohio-4703, ¶ 14.

{¶ 21} Regarding prudency, a prudent decision "contemplates a retrospective, factual inquiry, without the use of hindsight judgment, into the decision-making process of the utility's management," *Cincinnati v. Pub. Util. Comm.*, 1993-Ohio-79, ¶ 13; *see also In re Application of Suburban Natural Gas Co.*, 2021-Ohio-3224, ¶ 32 ("the prudent-investment test is backward-looking," asking whether the investment was "prudent when it was made").

### 1. OVEC's method of running the plants

{¶ 22} Appellants begin their manifest-weight-of-the-evidence challenge by claiming that the OVEC plants were run imprudently, leading to $74.5 million in charges for AEP Ohio's customers. They point to evidence in the record that shows a reasonable plant operator in a competitive marketplace would have conducted a daily financial analysis to determine whether a plant should be operated under an economic or must-run strategy. Such an analysis would account for the plant's operating costs and the expected revenues that would be gained from participating in the wholesale market. If the analysis shows that expected revenues will cover a plant's variable operating costs, the operator could commit the plant's output to the market. But if the analysis shows that the plant's variable operating

and other costs would exceed expected revenues, the operator should either operate the plant under an economic strategy or shut it down and await more favorable market conditions. Although AEP Ohio generally performs this type of analysis for its non-OVEC plants, OVEC failed to perform this analysis for 10 of its 11 units at the Kyger Creek and Clifty Creek plants. Appellants stress that instead of cycling the units on and off based on this type of daily analysis, OVEC kept the plants online in a must-run status for the vast majority of 2018 and 2019, leading to significant net-revenue losses.

{¶ 23} If this were the only record evidence bearing on the question whether the plants were prudently run, appellants' manifest-weight argument might have some merit. But the evidence presented at the commission's hearing ran in both directions, and the commission credited the evidence before it as establishing that AEP Ohio "prudently handled its OVEC entitlement," 2024 WL 4039778 at *23.

{¶ 24} The commission determined that it is "typical and common" for coal plants, such as the OVEC plants at issue here, to operate under a must-run strategy whereby they stay "essentially always online," but the commission added that some utilities and other stakeholders had begun to revisit this conventional wisdom. *Id.* Jason M. Stegall, manager of regulatory and pricing analysis for American Electric Power Service Corporation, testified on behalf of AEP Ohio. He explained that a must-run strategy was reasonable because the plants were designed to operate for baseload generation. A plant that operates for baseload generation is "normally operated to take all or part of the minimum load of a system, and . . . consequently produces electricity at an essentially constant rate and runs continuously." United States Energy Information Administration, *Glossary*, https://www.eia.gov/tools/glossary/?id=B (accessed Mar. 18, 2026) [https://perma.cc/8SWT-9326] (defining "base load plant"); *see also Merriam-Webster's Collegiate Dictionary* (12th Ed. 2026) (defining "baseload" as "the amount of power made available by an energy producer (such as a power plant) to

meet fundamental demands by consumers"). Stegall explained that "OVEC's units, as coal-fired generating units designed for baseload generation, are not capable of instantaneous startup and shutdown and, as wet-bottom coal units, are not designed to be cycled on and off frequently." He testified that frequently cycling the units on and off would introduce greater risks and costs, such as through wear and tear of the facilities due to thermal cycles or other cycling issues. He opined that because shutting down, restarting, and then ramping up a unit to a higher level of output comes with these risks and significant costs, "it may be more economical in the long run to keep the [OVEC] units on even if they lose money in the short run."

{¶ 25} The Natural Resources Defense Council ("NRDC"), which intervened in the proceedings below, *see* 2021 WL 4169349 at *10, also recognized that it may be true that keeping units online can be more economical because of cycling costs. Yet, NRDC criticized that process, noting that if the OVEC units were unable to cycle in accordance with profitability timelines, then the question was really whether they should run at all.

{¶ 26} But even despite the perceived shortcomings of the OVEC units, the commission relied on evidence, like Stegall's testimony, showing that AEP Ohio earned about $32 million in net revenue (i.e., revenues less variable costs) from selling its share of energy produced by the OVEC plants in the wholesale market during the audit period. While the commission noted that the net revenue was overcome by fixed costs, resulting in a net charge to AEP Ohio's customers, it observed that the charges would have been higher absent the net revenue.

{¶ 27} In view of the evidence outlined above, the commission concluded that AEP Ohio had deployed a prudent strategy with regard to operation of the OVEC plants during the audit period. 2024 WL 4039778 at *23. The commission recognized that in retrospect, it may have been more prudent in some months to favor an economic strategy over a must-run strategy, but it noted that a prudency inquiry assesses the soundness of a decision as of the time that it was made. *Id.*

11

{¶ 28} Based on the record evidence, we conclude that the commission did not clearly lose its way in reaching its determination. The commission was presented with conflicting evidence concerning the prudence of the must-run strategy, and it decided to credit the evidence showing that the strategy was prudent when the decision to utilize that strategy was made. That decision does not constitute reversible error. *See Ohio Power Co.*, 2018-Ohio-4698, at ¶ 45 ("the mere fact that evidence before the commission points both ways does not justify reversal").

### 2. *Removal of language from the draft audit reports*

{¶ 29} Appellants' arguments concerning LEI's removal of language from its draft audit reports do not alter the analysis. The auditor wrote in its initial draft report that "keeping the plants running does not seem to be in the best interests of ratepayers," but after receiving input from commission staff, the auditor replaced that language in a subsequent draft report with a statement that its analysis "shows that the OVEC contract overall is not in the best interest of AEP Ohio ratepayers." The auditor omitted this language from its final report. In its opinion and order, the commission disregarded the language in the draft reports because "rely[ing] upon draft language that was not included in the final audit report would be irresponsible." 2024 WL 4039778 at *22.

{¶ 30} According to appellants, "[o]nly by ignoring the draft audit reports and Staff's actions was the [commission] able to reach the exact opposite conclusion": that continuously running the OVEC plants was in the best interest of ratepayers. But appellants do not develop their argument much beyond this assertion. They seem to imply that commission staff thwarted an independent audit by improperly interfering with the auditor's work and that because staff's conduct was improper, the commission erred by not accounting for the draft-audit-report language that predated staff's interference.

{¶ 31} If appellants' depiction of the facts were all that the commission had before it, this might be a closer call. But the evidence is not so one-sided.

{¶ 32} On one hand, the RFP provided that the auditor must render an "independent audit." 2020 WL 12813029 at *6. The RFP did not flesh out what the commission meant by "independent audit," but that phrase commonly means "an audit made by usu[ally] professional auditors who are wholly independent of the company where the audit is being made," *Webster's Third New International Dictionary* (2002).[2] On the other hand, even if the phrase were broadened to include the auditor's independence from commission staff, the RFP specifically required the auditor to send "[t]wo copies of a draft" of the audit report to staff at least ten days before the final audit report was due, 2020 WL 12813029 at *9. It appears that this is a routine practice before the commission. *See In re Rev. of Duke Energy Ohio, Inc.'s Distrib. Capital Invest. Rider*, PUCO No. 23-549-EL-RDR, 2025 WL 71755, *12 (Jan. 8, 2025) ("it is routine and reasonable in third-party audits of utility rider cases before the Commission for the Auditor, utility, and Staff to meet or exchange correspondence when a draft audit [report] is circulated in order for the utility to identify portions of the audit that contain confidential information and to correct factual errors like typographical mistakes as well as verify calculated figures").

{¶ 33} In reaching its decision to adopt the audit report and the auditor's recommendations in this case, the commission disregarded the draft audit reports' language, because it "[did] not find any evidence of undue influence in the creation of the audit report or any reason to consider that LEI was prevented from conducting an independent review," 2024 WL 4039778 at *22. This determination

---

2. Since rendering its opinion and order in this matter, the commission has criticized a public utility's attempt to meddle in the audit process. *See In re Rev. of Duke Energy Ohio, Inc's. Distrib. Capital Invest. Rider*, PUCO No. 23-549-EL-RDR, 2025 WL 71755, *12-13 (Jan. 8, 2025) (chastising the public utility for engaging in "improper" conduct by attempting to sway an independent auditor's view of a legal issue that arose during an audit).

is supported by evidence in the record. Dr. Fagan testified that commission staff had asked her to make revisions to the final report based on its submission of the draft reports as required by the RFP; she testified that "upon reflection and getting the reaction back from [the] client," LEI agreed to make the requested revisions because the draft language had been "overly broad." But she added that LEI does not make revisions to a final audit report that it does not agree with and that the revisions LEI agreed to make in this case did not change the material findings of the audit. In other words, staff made suggestions about the draft reports, but Dr. Fagan retained the prerogative to decline those suggestions, which shows that LEI retained its independence from commission staff. In view of the totality of the record, we fail to see how the commission lost its way in declining to consider the draft audit reports' language.

{¶ 34} Finally, in their merit brief, appellants point to the Michigan Public Service Commission's decision in *In re Application of Indiana Michigan Power Co.*, Mich.Pub.Serv.Comm. No. U-20530, 2023 WL 1816183 (Feb. 2, 2023), as a decision "disallow[ing] costs from the same OVEC plants, involving the same 'must-run' bidding strategy, for [AEP Ohio's] affiliated Indiana/Michigan utility company." The problem with appellants' reliance on that decision is that they have asked us to determine whether the commission's decision *in this case* is against the manifest weight of the evidence. To answer that question, we must confine our review to the evidence that was presented below. Whatever evidence may have been presented to the Michigan Public Service Commission, and whatever conclusion that agency reached based on that evidence, is not germane to the fact-bound analysis required in this case.

{¶ 35} For these reasons, we reject appellants' first proposition of law.

*B. Whether the commission erred in denying OCC's request to issue a subpoena for the testimony of a commission staff member*

{¶ 36} Appellants divide their second proposition of law into two parts, both of which focus on the commission's denial of OCC's motion for a subpoena to compel Christopher to appear and testify at the commission's hearing. First, appellants claim that in denying the motion, the commission violated their due-process rights under both the United States and Ohio Constitutions. Second, appellants contend that in denying the motion, the commission violated its own rule governing the issuance of subpoenas. *See* Adm.Code 4901-1-28(E). Both arguments fail.

### 1. Due process

{¶ 37} Appellants contend that in denying OCC's motion for a subpoena, the commission violated appellants' right to a fair hearing under the Fourteenth Amendment to the United States Constitution, which provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. They also contend that in denying OCC's motion for a subpoena, the commission violated the Ohio Constitution's Due Course of Law Clause, which provides that "every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law." Ohio Const., art. 1, § 16. This court has construed the Ohio Constitution's Due Course of Law Clause as the functional equivalent of the United States Constitution's Due Process Clause. *See Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 48. However, the Ohio Constitution remains a document of independent force. *See State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, ¶ 19. Therefore, since appellants do not ask us to interpret the state Constitution's Due Course of Law Clause differently from the federal Constitution's Due Process Clause, we are constrained to review their argument under the federal clause. *See State v. Carter*, 2024-Ohio-1247, ¶ 34.

**{¶ 38}** The Due Process Clause "centrally concerns the fundamental fairness of governmental activity." (Cleaned up.) *North Carolina Dept. of Revenue v. Kimberley Rice Kaestner 1992 Family Trust*, 588 U.S. 262, 268 (2019). Appellants' concern here is with the clause's guarantee of procedural fairness, which provides the "opportunity to be heard at a meaningful time and in a meaningful manner." (Cleaned up.) *Lyle Constr., Inc. v. Dept. of Natural Resources, Div. of Reclamation*, 34 Ohio St.3d 22, 25 (1987). Appellants rely on a passage from the United States Supreme Court's decision in *West Ohio Gas Co. v. Pub. Util. Comm.*, a case that involved an appeal from this court's affirmance of a commission order in which the Supreme Court observed that to comply with the federal due-process clause, a commission proceeding must afford parties a "suitable opportunity through evidence and argument to challenge the result" (citation omitted), 294 U.S. 63, 70 (1935). Appellants maintain that without Christopher's testimony at the commission's hearing, they were prevented from challenging the result in this case.

**{¶ 39}** However, appellants fail to locate these broad precepts in the caselaw addressing due-process challenges to an agency's denial of a motion for a subpoena. Without attempting an exhaustive treatment of the relevant caselaw, we note that federal courts have held that a party's inability to subpoena a witness to testify at an administrative hearing does not constitute a per se violation of procedural due process. *See, e.g.*, *Foxy Lady, Inc. v. Atlanta*, 347 F.3d 1232, 1237 (11th Cir. 2003); *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 717 (7th Cir. 2000); *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *United States v. Woods*, 931 F.Supp. 433, 442 (E.D.Va. 1996). "As with other due process violations, to secure a reversal on the basis that the administrative agency failed to issue a requested subpoena, a party must demonstrate that the failure resulted in prejudice." (Cleaned up.) *Flynn v. State Med. Bd.*, 2016-Ohio-5903, ¶ 58 (10th Dist.).

{¶ 40} Here, appellants were not prejudiced by the commission's denial of OCC's motion for a subpoena. Dr. Fagan testified at the commission's hearing and was subject to cross-examination. Christopher's supervisor, Windle, also testified at the hearing and was subject to cross-examination. Windle testified that it was his decision—not Christopher's—to approach the auditor with concerns about language in the draft audit reports: he explained that his concern was that the language used in the draft reports arguably could have been viewed as criticizing the commission's decision to approve the PPA Rider in the first place.

{¶ 41} In view of the cross-examinations of Dr. Fagan and Windle, it is unclear whether Christopher's testimony would have added anything meaningful to the record. And appellants offer no more than speculation in claiming that her testimony was needed for them to challenge the commission's decision in this case. Appellants "presume" that Christopher knew more than anyone else about what transpired between commission staff and the auditor regarding changes made to the draft audit reports. But that presumption is dubious in view of Windle's testimony. And in any event, testimony by Dr. Fagan and Windle adequately covered the topic of appellants' concern.

{¶ 42} Accordingly, appellants have not shown that the commission committed a procedural due-process violation by denying OCC's motion for a subpoena to compel Christopher to appear and testify at the commission's hearing.

### 2. Adm.Code 4901-1-28(E)

{¶ 43} In addition to their due-process argument, appellants claim that in denying OCC's motion for a subpoena, the commission violated Adm.Code 4901-1-28(E). That rule provides that "any person making or contributing to the report [of an investigation into rate proceedings] may be subpoenaed to testify at the hearing," if a hearing is scheduled in the case in which the report is filed. In appellants' view, Christopher contributed to the final audit report by way of her

email to the auditor, which led to the removal of certain language that had been contained in the draft reports.

{¶ 44} Even if Christopher's conduct falls within the meaning of "contributing," as that term is used in Adm.Code 4901-1-28(E), the rule says that any person "may"—rather than "shall"—be subpoenaed to testify at a commission hearing. As the attorney examiner observed in initially holding the motion for a subpoena in abeyance—which she later denied at the hearing—the rule's use of "may" conveys that no party is automatically entitled to the issuance of a subpoena. *See* 2022 WL 94394 at *3. That observation squares with the axiom that the word "may" generally signifies the grant of discretionary authority unless the context shows otherwise. *See State v. Stutler*, 2022-Ohio-2792, ¶ 15; *Renacci v. Testa*, 2016-Ohio-3394, ¶ 31. Here, appellants have not pointed to anything in the context of Adm.Code 4901-1-28(E) that suggests its use of the word "may" should be understood according to anything other than that axiom.

{¶ 45} In upholding the attorney examiner's denial of OCC's motion for a subpoena, the commission observed that the attorney examiner struck the proper balance between permitting latitude in questioning witnesses and keeping the hearing moving in an orderly and expeditious manner. *See* 2024 WL 4039778 at *12. The commission did not abuse its discretion in reaching this conclusion. *See In re Application of Champaign Wind, L.L.C.*, 2016-Ohio-1513, ¶ 16 (applying an abuse-of-discretion standard to the Power Siting Board's decision to quash a third-party subpoena). The record here establishes that appellants had a full opportunity to cross-examine Dr. Fagan and Windle at the commission's hearing, during which they could have asked about the reasons underlying the removal of certain language from the final version of the audit report. Appellants have failed to advance a cogent argument explaining why, after several days of hearing, it was essential to plow this same ground with Christopher.

**{¶ 46}** Consequently, appellants have not shown that the commission violated Adm.Code 4901-1-28(E) in denying OCC's motion for a subpoena.

*C. Whether the commission erred in applying an undue-influence standard to its determination whether LEI was prevented from conducting an independent audit*

**{¶ 47}** In their third proposition of law, appellants contend that the commission erred in applying an undue-influence standard to its determination whether commission staff or AEP Ohio prevented LEI from conducting an independent audit. Appellants assert in their merit brief that the correct legal standard to be applied in such cases is found in the American Institute of Certified Public Accountants' Code of Professional Conduct, which provides that a member of the institute "in public practice should be independent in fact and appearance when providing auditing and other attestation services" and that "[i]ndependence precludes relationships that may appear to impair a member's objectivity in rendering attestation services," AICPA Code of Professional Conduct 0.300.500.01 and 0.300.50.02 (Dec. 15, 2014), https://pub.aicpa.org/codeofconduct/ethicsresources/et-cod.pdf (accessed Mar. 20, 2026) [https://perma.cc/X47B-M7JQ]. Appellants characterize this as an appearance-of-impropriety standard.

**{¶ 48}** We first consider whether appellants properly preserved this argument. In its first rehearing entry, the commission cited *In re Buckeye Wind, L.L.C.*, 2016-Ohio-5664, ¶ 14, in support of its determination that appellants failed to preserve their appearance-of-impropriety argument because they asserted that argument for the first time in their initial applications for rehearing. *See* 2024 WL 4581311 at *5. In *Buckeye Wind*, we held that opponents of a wind-farm project forfeited their objection to the Power Siting Board's decision limiting the scope of its hearing by failing to object to an administrative-law judge's determination in a prehearing entry that certain issues fell outside the scope of the hearing. *See Buckeye Wind* at ¶ 3, 7, 15, 18-19. We rejected the opponents' argument that they

had preserved their objection by advancing it in their rehearing application, observing that the "availability of [the rehearing] process does not mean that a party may sit idly and withhold all objections before and during a board hearing and then belatedly raise them in a rehearing application." *Id.* at ¶ 18.

{¶ 49} This case, however, presents a different situation. The commission first applied the undue-influence standard in its opinion and order. *See* 2024 WL 4039778 at *22; 2024 WL 4581311 at *5. Therefore, unlike in *Buckeye Wind*, appellants' first opportunity to challenge the commission's application of the undue-influence standard in this case was by way of their initial rehearing applications.

{¶ 50} Although appellants preserved their argument concerning an appearance-of-impropriety standard, we need not dwell long on the argument's merits, because appellants fail to support their argument with any authority that binds the commission to use that standard. Moreover, the commission has previously applied the undue-influence standard when deciding whether to approve an independent audit report. *See In re Rev. of the Reconciliation Rider of Duke Energy Ohio, Inc.*, PUCO No. 20-167-EL-RDR, 2023 WL 5880399, *13 (Sept. 6, 2023) ("The Commission . . . does not find any evidence of undue influence in the creation of the audit report or any reason to consider that LEI was prevented from conducting an independent review."). And we have observed that the commission should respect its own precedents to ensure predictability. *See In re Application of Ohio Power Co.*, 2025-Ohio-3034, ¶ 36. If, as a matter of policy, it would be sensible to require the commission to apply an appearance-of-impropriety standard in cases involving independent-audit reports prepared for the commission's benefit, then the General Assembly, not this court, must be the one to require such a standard. *See Kaminski v. Metal & Wire Prods. Co.*, 2010-Ohio-1027, ¶ 61 (the General Assembly is responsible for weighing policy concerns and making policy decisions; the courts are charged with evaluating the legality of the

General Assembly's legislative choices, not second-guessing those choices); *Arbino*, 2007-Ohio-6948, at ¶ 71 (same); *Weidman v. Hildebrant*, 2024-Ohio-2931, ¶ 61 (Kennedy, C.J., dissenting) ("The General Assembly is the final arbiter of public policy in Ohio.").

{¶ 51} The United States Supreme Court's decision in *United States v. Arthur Young & Co.*, 465 U.S. 805 (1984), which appellants cite, is not to the contrary. The question in that case was whether tax-accrual workpapers prepared by an independent auditor for a corporate client should be excepted from disclosure to the Internal Revenue Service under a federal statute based on a form of work-product immunity. *See id.* at 815. In answering that question, the Court adverted to an auditor's role as a "public watchdog" who demands total independence from the client. *Id.* at 818. Missing from the Court's analysis is any reference to an appearance-of-impropriety standard.

{¶ 52} Appellants next advance an argument under this proposition of law that is unrelated to the appearance-of-impropriety standard: they insist that the commission ran afoul of this court's precedent in *Tongren v. Pub. Util. Comm.*, 1999-Ohio-206. In *Tongren*, the commission issued an order in which it relied on numerous references to "findings" of its staff. *Id.* at ¶ 10. Yet nothing in the record contained those "findings." *Id.* We held that the commission committed reversible error by rendering a decision on an issue without disclosing the facts on which it relied. *Id.* at ¶ 19-20.

{¶ 53} In contrast to *Tongren*, it is clear here which evidence the commission relied on in determining that LEI did not sacrifice its independence in the audit process: the commission pointed to the testimony of Dr. Fagan, who had testified that LEI takes responsibility for the contents of its audit reports and that notwithstanding any comments that LEI received from commission staff or AEP Ohio regarding the draft audit reports in this case, the final report reflects her "own view of what ought to be in there." *See* 2024 WL 4039778 at *22.

{¶ 54} For these reasons, we reject appellants' third proposition of law.

### III. CONCLUSION

{¶ 55} The orders of the Public Utilities Commission are affirmed. Because we reject appellants' three propositions of law, we do not reach their refund-related arguments.

Orders affirmed.

_____

Maureen R. Willis, Ohio Consumers' Counsel, and John Finnigan, John R. Varanese, and William J. Michael, Assistant Consumers' Counsel, for appellant Office of the Ohio Consumers' Counsel.

Carpenter Lipps, L.L.P., Kimberly W. Bojko, and Emma Y. Easley, for appellant Ohio Manufacturers' Association Energy Group.

Dave Yost, Attorney General, John H. Jones, Public Utilities Section Chief, and Julian P. Johnson and Thomas G. Lindgren, Assistant Attorneys General, for appellee.

Steven T. Nourse and Michael J. Schuler; and Porter, Wright, Morris & Arthur, L.L.P., L. Bradfield Hughes, and Eric B. Gallon, for intervening appellee.

_____